.

# COURT OF APPEAL

# FIRST CIRCUIT

# STATE OF LOUISIANA

\* \* \* \* \* \* \* \*

## DOCKET NUMBER: _____

\* \* \* \* \* \* \* \*

## STATE OF LOUISIANA

versus

## DARNAY THIBODAUX

\* \* \* \* \* \* \* \*

**APPLICATION FOR SUPERVISORY REVIEW BY
DARNAY THIBODAUX FROM THE
JUDGMENT OF THE 22nd JUDICIAL DISTRICT COURT
PARISH OF ST. TAMMANY, STATE OF LOUISIANA
DOCKET NO. 543638-1,
THE HONORABLE RICHARD A. SWARTZ PRESIDING**

\* \* \* \* \* \* \* \*

**ORIGINAL BRIEF OF DEFENDANT/APPELLANT
DARNAY THIBODAUX**

**Defendant/Appellant**

\* \* \* \* \* \* \* \*

Respectfully submitted,

**CLAIBORNE W. BROWN (25594)
222 North Vermont Street, Suite I
Covington, LA  70433
Telephone:  (985) 246-7063
Facsimile:  (985) 246-7080**

## EXPEDITED CONSIDERATION AND
## STAY OF EXECUTION OF SENTENCE REQUESTED

### **I N D E X**

**PAGE**

AFFIDAVIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

JURISDICTION OF THE COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . .vii

**REQUEST FOR EXPEDITED CONSIDERATION**. . . . . . . . . . . . . .viii

**REQUEST FOR STAY OF EXECUTION OF SENTENCE**. . . . . . . . viii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ISSUES TO BE CONSIDERED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

SPECIFICATION OF ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## AFFIDAVIT

**BEFORE ME,** the undersigned authority, personally came and appeared **CLAIBORNE W. BROWN,** who being first duly sworn, did depose and say that on behalf of his client, DARNAY THIBODAUX, he has applied for Supervisory Review to the First Circuit Court of Appeal of the State of Louisiana based on a decision of the Honorable Richard A. Swartz, Judge, 22nd Judicial District, regarding the claims of DARNAY THIBODAUX and that all allegations in this Writ Application are true and correct to the best of his knowledge, information and belief.

**THAT HE DOES HEREBY CERTIFY** that the District Court and all counsel have been notified of this Writ Application and that all concerned have been served with these documents.

**THAT HE DOES HEREBY CERTIFY** that a copy of this application and accompanying proposed Order have been filed with the First Circuit Court of Appeal in Baton Rouge, Louisiana, and sent to the Honorable Richard A. Swartz, and the following counsel of record by depositing same in the U. S. Mail, postage prepaid and properly addressed, at Covington, Louisiana, this 18th day of February, 2015.

TRIAL COUNSEL FOR THE STATE OF LOUISIANA:
> State of Louisiana, Office of the Attorney General
> Mr. Johnathan Blake, Assistant Attorney General
> 1885 N. Third Street
> Baton Rouge, LA  70804
> Telephone:  (225) 326-6200

PRESIDING JUDGE, 22nd JUDICIAL DISTRICT COURT:
> The Honorable Richard A. Swartz
> 22nd Judicial District Court
> 701 N. Columbia Street
> Covington, LA 70433
> Telephone:  (985) 809-5315

**CLAIBORNE W. BROWN**

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 18th DAY OF FEBRUARY, 2015.

**NOTARY PUBLIC**

Tommy D. Snyder, Jr.
**(Print Notary Name)**

28764
**(Notary I.D. No. or Bar Roll No.)**

TOMMY D. SNYDER, JR.
NOTARY PUBLIC
Parish of St. Tammany, State of Louisiana
LSBA 28764
My Commission is Issued for Life.

iii

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Boykin v. Alabama,*
395 U.S. 238, 89 S. Ct. 1709 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Burton v. Wilmington Parking Authority,*
365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961). . . . . . . . . . . . . . . . 59-60

*Chambers v. Mississippi,*
410 U.S. 284, 295, 93 S. Ct. 1038). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Harris v. Thompson,*
698 F.3d 609 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . .41-45, 47-53

*N.C.A.A. v. Tarkanian,*
88 U.S. 179, 192, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988). . . . . . . . . 58-59

*Noe v. Roussell,*
310 So. 2d 818-19 (La. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56-57

*State v. Boudreaux,*
616 So. 2d 733, 736 (La. App. 1 Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . .39

*State v. Carmouche,*
589 So. 2d 53, 55 (La. App. 1 Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 40

*State v. Hayes,*
423 So. 2d 1111 (La. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State v. Lewis,*
633 So. 2d 315, 317 (La. App. 1 Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . .39

*State v. Stewart,*
47,679 (La. App. 2 Cir. 1/16/13), 109 So. 3d 915, 919 . . . . . . . . . . . . . . .39

*State v. Thompson,*
2011-0915 (La. 5/8/12), 93 So. 3d 553. . . . . . . . . . . . . . . . . . . . . . . . . . .40

*State v. Wynne,*
40,921 (La. App. 2 Cir. 4/12/06), 926 So. 2d 789. . . . . . . . . . . . . . . . .39, 40

*United States v. Valenzuela-Bernal,*
458 U.S. 858, 102 S. Ct. 3440 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

iv

*Washington v. Texas*,
388 U.S. 14, 87 S. Ct. 1920 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## **STATUTES**

La. R.S. 14:93.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

La. C. Cr. P. art. 559. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## LIST OF EXHIBITS

| **Exhibit** | **Pages** | **Document** |
|---|---|---|
| Exhibit "1" | 1 | Bill of Information; |
| Exhibit "2" | 2-36 | Motion to Enroll as Counsel of Record (w/Exhibits); |
| Exhibit "3" | 37-48 | Motion to Exclude Expert Testimony (w/o Exhibits); |
| Exhibit "4" | 49-229 | Motion to Withdraw Guilty Plea/Motion to Dismiss Indictment (w/ Exhibits); |
| Exhibit "5" | 230-323 | Supplemental Memorandum in Support of Motion to Withdraw Guilty Plea/Motion to Dismiss Indictment (w/ Exhibits); |
| Exhibit "6" | 324-345 | Sentencing Memorandum (w/ Exhibits); |
| Exhibit "7" | 346-352 | State's Memorandum in Opposition to Motion to Withdraw Plea and Motion to Dismiss; |
| Exhibit "8" | 353-354 | Minutes of December 15, 2014 hearing on Motion to Exclude Testimony; |
| Exhibit "9" | 355-359 | Minutes of December 17, 2014 Pleas of Guilty Calvin Thibodaux and Darnay Thibodaux; |
| Exhibit "10" | 360-361 | Minutes of January 29, 2015 hearing on Motion to Withdraw Plea and Motion to Dismiss; Sentencing |
| Exhibit "11" | 362-363 | Notice of Intent to File Writ Application and Return Day; |
| Exhibit "12" | 364-365 | Motion for Stay of Execution of Sentence and Order Denying Same; |
| Exhibit "13" | 366-368 | Motion for Production of Pre-Sentence Investigation Report and Order Granting Conditional Release; |

## JURISDICTION OF THE COURT

Supervisory jurisdiction is vested in the Courts of Appeal by virtue of the authority granted in Article V. Section 10, of the 1974 Constitution of the State of Louisiana.  It is this jurisdiction that the appellant invokes.

## REQUEST FOR EXPEDITED CONSIDERATION
## REQUEST FOR STAY OF EXECUTION OF SENTENCE

Defendant herein requests expedited consideration of this writ application and a stay of execution of the sentence imposed by the District Court on January 29, 2015.   As part of the sentence imposed in this matter, Defendant has been sentenced to 10 years imprisonment with 5 years suspended.   Defendant was immediately remanded to the custody of the Louisiana Department of Corrections and is currently located in the Madison Parish Louisiana Transitional Center for Women, 1005 West Green Street, Tallulah, Louisiana, 71282.

Defendant herein has raised a number of significant Constitutional Violations, namely a violation of the Compulsory Process Clause and the Due Process Clause of the Sixth and Fourteenth Amendments to the United States Constitutions.   As such, Defendant requests expedited consideration of this Application for Supervisory Review.

Defendant herein protests her innocence and requests, in addition to expedited consideration, that the sentence imposed by the District Court be stayed pending the determination of this Application for Supervisory Review.   Defendant avers that she has filed a Motion with the District Court for Stay of Execution of Sentence, which has been denied.

## STATEMENT OF THE CASE

This is a disturbing case of the State of Louisiana arbitrarily taking a side in what is primarily a successions dispute between the Defendant (and her former husband) and the relatives (nephews) of an elderly gentleman named Sidney Dobronich, who passed away in March of 2014 having no children and pre-deceasing his wife.  The Defendant in this case at this very time maintains a strong claim of heirship to the succession of Mr. Dobronich, who she befriended and for whom she cared for over two years.  Relatives of Mr. Dobronich (nephews), who previously had no relationship with him other than by blood and by a selfish interest in his considerable financial wealth, coercively and fraudulently obtained a power of attorney over him, then coerced him executed olographic testament in their favor.  This was accomplished as they, and their politically connections, had enlisted the full power of both state and federal law enforcement to wrongfully investigate and intimidate Defendant and Mr. Dobronich.   As these proceedings have progressed, the State of Louisiana, fully and unequivocally advocating for these relatives, have openly and viciously retaliated against Defendant for daring to challenge the openly wrongful activities of these relatives and assert her rightful claims to the succession.  Unfortunately, Defendant now finds herself incarcerated, sentenced to five years of a ten year sentence in prison for violation of Louisiana Revised Statutes 14:93.4, Exploitation of the Infirmed.   In particular, this conviction was obtained through a guilty plea that was circumstantially coerced by way of a blatant and cynical violation of her rights to Compulsory Process under the Sixth Amendment of the United States Constitution and to fundamental Due Process under the Fifth and Fourteenth Amendments.   These Constitutional

violations, and the fundamental concept of Justice, demand that the Defendant be permitted to withdraw her guilty plea and that this abusive prosecution against her be dismissed.

**1) Background Facts:**

The background facts in this case are derived from the State's own investigation, from court records in the related civil lawsuits and certified medical records introduced into the record of the proceedings herein.   Though the conclusions drawn therefrom are in dispute, the background facts are largely undisputed by the State of Louisiana.

In July of 2010, Defendant, Darnay Thibodaux and her husband, Calvin Thibodaux, met Mr. Sidney Dobronich ("Mr. Dobronich"), when they rented property next door to Mr. Dobronich's property at 29145 Nell Drive, Bogalusa, Louisiana 70427 (Mr. Dobronich's address was 29127 Nell Drive, Bogalusa, LA 70427).   **(Exhibit Record at 5-6, 195-96.)**  Mr. Dobronich was an elderly man who lived alone in a single family trailer on his property. *Id.*  Mr. Dobronich was not married and did not have any children or grandchildren. *Id.*  From 2010 through 2013, Claimant became friends with Mr. Dobronich and also began performing care-giving services for Mr. Dobronich. *Id.*  In addition to cooking, cleaning and assisting Mr. Dobronich with bathing and hygiene, claimant and her family would spend holidays with Mr. Dobronich. *Id.*

Throughout the time that Defendant was performing care-giving services to Mr. Dobronich, beginning in the Summer of 2012 through February of 2013, Mr. Dobronich and Claimant had several conversations whereby Mr. Dobronich expressed a strong desire not to be placed in a nursing home and to be allowed to

2

live out his life at his home at 29127 Nell Drive, whereby Claimant expressed to Mr. Dobronich her intention to continue to take care of Mr. Dobronich and not to allow him to be placed in a nursing home. **(Ex. R. at 6-7, 195-96.)** Defendant and Mr. Dobronich also discussed Defendant and her husband developing and managing rental property with Mr. Dobronich's financial assistance, which would include the property at Nell Drive, as well as other property. **(Ex. R. at 6-7.)**

In February of 2013, Mr. Dobronich, having no living wife or children, came to an understanding whereby he named the Thibodauxs as residual beneficiaries of his estate. The Thibodauxs would take care of Mr. Dobronich and allow him to live out the rest of his life on his property in Bogalusa, Louisiana, and would also assist Mr. Dobronich with the maintenance of his property. *Id.* Mr. Dobronich also would assist Defendant and her husband with acquiring and maintaining rental property near Mr. Dobronich's home. Defendant contends that the purpose of this assistance on behalf of Mr. Dobronich was to give Defendant and her husband a substantial financial incentive to remain co-located with Mr. Dobronich at his home on Nell Drive.[1]

On February 12, 2013, Mr. Dobronich was hospitalized for a heart attack. While recovering in the hospital, Mr. Dobronich decided to execute several instruments in favor of the Thibodauxs. On February 14, 2013, Mr. Dobronich executed a statutory will in favor of the Thibodauxs, as well as a power of attorney executed in favor of Darnay Thibodaux, which provided Defendant with access to Mr. Dobronich's finances. **(Ex. R. at 5-7, 163-170.)**

---

[1] The evidence in this case indicated that Mr. Dobronich attempted a similar relationship with a step grandson who lived in the State of Washington. *See* **Footnote 8 and accompanying text,** *infra.*

3

At the time the will and power of attorney were executed, Mr. Dobronich's finances consisted of a retirement account worth approximately $950,000, **(Ex. R. at 103)**; several largely unused bank accounts, each containing between $15,000 and $30,000, as well as an unknown amount of cash, **(Ex. R. at 117-120, 331-343)**. From February through mid-March of 2013, Defendant, with the use of Mr. Dobronich's power of attorney, engaged in over 30 transactions, which included purchases, cash withdrawals and transfers, totaling over $334,000. **(Ex. R. at 117-120.)** The transactions involved transfers that were conducted by Mr. Dobronich's investment broker, Mr. Joseph Romano, at the specific direction of both Defendant and Mr. Dobronich. *Id.* The Defense contends that, notwithstanding the power of attorney, which was granted for Mr. Dobronich's convenience; Mr. Dobronich was mentally sharp and financially savvy, maintained specific cognizance of all of his finances:   Defendant did not execute any transaction without the specific DIRECTION from and AUTHORIZATION of Mr. Dobronich.

On March 12, 2013, Mr. Dobronich was brought to the hospital for surgery due to falling and breaking his hip. **(Ex. R. at 97.)** On or around March 15, 2013, two of Mr. Dobronich's nephews George and Forest Dobronich ("the Nephews"), were informed by another cousin that their uncle had begun spending money from his retirement account. **(Ex. R. at 161.)** Other than a general awareness of and specific interest in Mr. Dobronich's finances, the Nephews had virtually no connection with the daily life of Mr. Dobronich:  they did not visit him on a daily basis, did not assist with cooking, cleaning, or caring for him, nor did they assist in home or property maintenance; nor did they spend holidays with him, nor invite him to spend time with them or their children. *Id.*

4

On March 18, 2013, the Nephews engaged the St. Tammany Parish Sheriff's Office in an investigation of the Thibodauxs for elder exploitation. **(Ex. R. at 162.)**[2] The investigation was conducted by Detective Stefan Montgomery. Det. Montgomery's investigation proceeded from March 18, 2013 through April 4, 2013. **(Ex. R. at 113-138.)** His investigation involved a search of Mr. Dobronich's financial records, **(Ex. R. at 117-120)**, interviews with Mr. Dobronich, **(Ex. R. at 115-16, 121-22, 131)**, the Thibodauxs as well as representatives from various financial institutions, **(Ex. R. at 117-20, 123)**. Det. Montgomery also engaged the support of the United States Secret Service, and on March 27, 2013, conducted an armed "search" of the Thibodaux residence and the residence of Mr. Dobronich and seized several items from their respective residences. **(Ex. R. at 125, 203.)**

Det. Montgomery attempted to create a narrative that Mr. Dobronich had lived off of a $1,200 per month stipend from his $950,000 investment account, that he never made any other financial transactions, that the Thibodauxs had obtained a power of attorney while Mr. Dobronich was hospitalized and had used the power of attorney to spend over $300,000.00 of Mr. Dobronich's money on purely personal items without Mr. Dobronich's knowledge or consent; that this spending was brought to the attention of his concerned Nephews by Mr. Dobronich's broker and that the Nephews were the heirs to Mr. Dobronich's estate. **(Ex. R. at 113, 114, 120.)** The evidence collected by Det. Montgomery established the following:

---

[2] The Nephews did not file their complaint on March 16, 2013; at the time they purportedly "discovered" from Mr. Dobronich himself that the transactions were not authorized, based on Mr. Dobronich's conversation with Mr. Romano at the hospital. **(Ex. R. at 161.)** On March 18, 2013, the Nephews demanded that they be added to the power of attorney. **(Ex. R. at 162.)** After being refused, the Nephews filed their complaint with the St. Tammany Parish Sheriff's Office. *Id.*

1) The financial records uncovered by Det. Montgomery established that Mr.

Dobronich maintained very complicated and convoluted financial

arrangements, with several bank accounts each drawing income from

different sources, as well as a large and unknown source of cash, and of

which neither Det. Montgomery, nor even Mr. Dobronich's broker, were

fully aware.   **(Ex. R. at 5115, 117-119, 331-344.)**[3]   These financial

arrangements involved the establishment of several bank accounts and the

maintenance of a substantial, and unknown supply of cash by Mr.

Dobronich.   *Id.*[4]   The Defense contends that this complex financial

---

[3] Joseph Romano was, or is, not aware of the full extent of Sidney Dobronich's financial affairs; and neither was, or is, the State of Louisiana prior to February 2013. During the course of the investigation, Det. Montgomery discovered four bank accounts belonging to Mr. Dobronich, two with Capital One Bank and two with Citizens Savings Bank, each with varying amounts of money and with varying amounts of monthly deposits. The Capital One savings account, account no xxxxxx1720, into which the $1,200 per month was being deposited "for living expenses" showed no other activity prior to February 2013, indicating that Sidney Dobronich was not using the Capital One account xxxxxx1720 for living expenses. **(Ex. R. at 115, 117, 334-36.)** Likewise, the only other account that showed any activity in terms of withdrawals prior to Mr. Dobronich's Citizens Savings checking account xxxxxx1994, contained a total amount of withdrawals for the 3 months prior to December of 2012 at 1) November 2012: $112.85 (with $79.98 being paid to Charter Cable); 2) October 2012: $110.44 (with $79.98 being paid to Charter Cable); September 2012: $117.71 (with $79.61 being paid to Charter Cable). **(Ex. R. at 332-33.)** It is clear the Sidney Dobronich was paying his cable bill and living off $30 per month, and the Mr. Dobronich had another source, or sources, of income of which Joseph Romano and even the State of Louisiana is not aware. This is evident by the Likewise, as acknowledged by Det. Montgomery, Darnay Thibodaux initially requested the first transfer of $30,000 to be made to the Citizens Savings checking account xxxxxx1994. **(Ex. R. at 115.)** However, Mr. Romano refused to make the transfers to that account due his understanding that "the account was not set up by Mr. Dobronich." *Id.*

[4] As mentioned in the above footnote, Mr. Dobronich maintained several bank accounts which show limited use. However, the first month's transaction history of Citizens Bank Checking account, no. xxxxxx1994, shows an interesting pattern that is reflective of what Det. Montgomery uncovered in February and March of 2013. The Citizens Bank checking account was opened on March 23, 2011 with a $5,000 cash deposit from Mr. Dobronich's Citizen's Bank savings account, no. xxxxxx1420. **(Ex. R. at 332-33.)** On March 29, 2011 Mr. Dobronich made a $5,000 cash withdrawal, which reduced the account balance to $0. **(Ex. R. at 332.)** From April 4 through April 11, Mr. Dobronich's checking account incurred overdraft fees and NSF returns. On April 12, 2011, Mr. Dobronich made two deposits into the checking account, from unknown sources, in the amounts of $95.40 and $24,734.11, respectively. *Id.* Additionally, Mr. Dobronich also opened his Citizens Bank savings account, no. xxxxxx1435, with an opening balance of $29,488.79. **(Ex. R. at 331.)**

arrangment was specifically intended by Mr. Dobronich in large part due to his fear of being exploited and taken away from his home by his Nephews.

2) Several of the financial records obtained constituted checks that were signed by Mr. Dobronich himself. **(Ex. R. at 117.)** In one instance, a check for a specific transaction (purchase of a handicapped accessible camper which was to be placed adjoining Defendant's trailer to facilitate Mr. Dobronich's rehabilitation and recovery from his broken hip) was completely written by Mr. Dobronich himself and presented for payment after the initial attempted transaction was prevented due to the freezing of bank accounts by law enforcement pursuant to the investigation. **(Ex. R. at 123.)**[5] Additionally, the large scale transactions abruptly ceased on March 13, 2013 (one day after Mr. Dobronich was admitted to the hospital). **(Ex. R. at 117-120.)**[6] Likewise, testimony indicated that Mr. Dobronich's broker

---

[5] Of the several transactions that were successfully made, it is the unsuccessful Berryland Camper transaction that further indicates Mr. Dobronich's intentions and evidences that the others were performed with his explicit authorization. As noted by Det. Montgomery, the Thibodauxs, on March 15, 2013, attempted a partial payment for a handicapped accessible camper from Calvin Thibodaux's resource bank account in the amount of $17,697.93. **(Ex. R. at 121.)** Det. Montgomery noted that on March 24, 2013, the Thibodauxs were aware that the Resource Bank account had been frozen and were concerned about the partial payment to Berryland campers drawn from the Resource Bank account. **(Ex. R. at 123.)** Det. Montgomery then notes an attempt by the Thibodauxs, on March 24, 2013, to use another check, drawn from Mr. Dobronich's Capital One bank account, attempting to pay off the balance of the camper. **(Ex. R. at 123.)** The March 24, 2013 check was not only signed by Mr. Dobronich, but was entirely written in his handwriting. **(Ex. R. at 183.)**

[6] In fact, the only large scale item that Det. Montgomery was able to find that was attempted to be purchased by the Defendant after March 13, 2013 was the handicapped accessible camper, which purchase was attempted from March 15 through March 19, 2013. **(Ex. R. at 121.)** Coincidentally, Defendant had been at the hospital with Mr. Dobronich discussing Mr. Dobronich's rehabilitation options with him and with hospital staff on March 15, 2013. **(Ex. R. at 195-96.)**

7

specifically witnessed Mr. Dobronich authorize a substantially large transfer from the investment account. **(Ex. R. at 174, 255.)**[7]

3) Almost all of the purchases discovered were located on the Thibodauxs property, next door to Mr. Dobronich's property and were consistent with the maintanence and development of rental property. **(Ex. R. at 126-30.)** Likewise the real estate purchase at 29066 Ellis Drive and another attempted real estate purchase at 28529 Hall Road were all within ¼ mile of the Thibodaux/Dobronich residences[8] and were, likewise consistent with development and maintenance of rental property and Mr. Dobronich's intent to give the Defendant and her husband a strong financial incentive to remain co-located with him at his home on Nell Drive. *Id.*

4) The interview with the investment broker and the March 27, 2013 raid uncovered evidence that Mr. Dobronich had previously attempted to form an arrangement, similar to the arrangement formed with the Thibodauxs, with his step grandson, Mr. Craig Burdine, executing a power of attorney in his favor, allowing him access to his finances, purchasing land for Mr. Burdine, in his name.[9]

---

[7] As recounted by Mr. Romano in his statement and testimony, on March 5, 2013, Defendant contacted Mr. Romano requesting a transfer of $179,000 from the investment account to Mr. Dobronich's Capital One savings account. **(Ex. R. at 174.)** Mr. Romano demanded to speak directly to Mr. Dobronich. Mr. Dobronich spoke directly to Mr. Romano and authorized the $179,000 transfer. *Id.* Despite attempting to qualify the conversation, stating that he could hear Defendant in the background, Mr. Romano made the $179,000 transfer, as requested. *Id.*

[8] The actual physical locations of these properties are not part of the record, but their proximity is admitted by Det. Montgomery in his report. The property located at 26099 is acknowledged as being "one street over from the Thibodaux residence" ,**(Ex. R. at 121)**, and the property located at 28529 Hall Road is noted as "near their address", **(Ex. R. at 127.)**

[9] The testimony of Mr. Joe Romano indicates that Mr. Dobronich, in 2009, withdrew his entire portfolio from Romano Investments, only to return his assets in May of 2011. **(Ex. R. at 103, 173, ll. 12-17.)** Mr. Romano also notes in his statement that he was aware that "there were problems" and that "there was a strained relationship between Mr. Dobronich and Craig." **(Ex.**

5) The March 27, 2013 raid covered both the Thibodaux residence at 29145

Nell Drive and Mr. Dobronich's residence at 29127 Nell Drive did not

uncover any instrument or testament purporting to name the Nephews as

beneficiaries of Mr. Dobronich. **(Ex. R. at 125-30.)** The March 27, 2013

raid did uncover the original February 14, 2013 statutory will in favor of the

Thibodauxs and the power of attorney. **(Ex. R. at 126.)**

While the substantial majority of the evidence supports the contention that

the transactions performed by the Thibodauxs were made with the express

---

**R. at 255.)** In March of 2011, Mr. Dobronich revoked a power of attorney previously granted in favor of Mr. Craig Burdine.     **(Ex. R. at 152.)**   Mr. Craig Burdine is identified by Det. Montgomery as "Mr. Dobronich's step grandson" who is further acknowledged to have "handled some of Mr. Dobronich's affairs previously through the Romano Insurance and Investment Group." **(Ex. R. at 113.)** Mr. Dobronich also had executed a settlement agreement with Mr. Burdine which included the following clause:

> BURDINE, his heirs, executors, administrators, and assigns, hereby release and forever hold harmless DOBRONICH (and his heirs, executors, administrators, and assigns) from any and all present, past or future claims, civil or otherwise, which can or every [sic] may be asserted by BURDINE or his heirs, executors, administrators, and assigns, against DOBRONICH in connection with BURDINE'S investment and management of funds on behalf of DOBRONICH, or any matter related thereto, including the decision to end the trust [sic]

**(Ex. R. at 153.)**
Additionally, the evidence shows that Mr. Dobronich, prior to the estrangement, made several sizable transfers of property to Mr. Burdine.  The first is a donation of real estate in Washington State to Mr. Burdine by Mr. Dobronich and Mr. Dobronich's surviving wife in 2003, which is characterized as a "gift from grandparents." **(Ex. R. at 246.)** More striking is the fact that, upon examination of the Court records, Mr. Burdine's name, and not Mr. Dobronich's, is on the deed to the land upon which Mr. Dobronich lived, 29127 Nell Drive. **(Ex. R. at 249-51.)** The records indicated that, not only was the land purportedly purchased by Mr. Burdine on July 8, 2009 for $20,000, *Id.*; but the trailer was also purportedly purchased by Mr. Burdine on July 17, 2009 for $44,682.50, **(Ex. R. at 252)**.
Also of considerable interest, as noted Detective Montgomery, was the creation of Mr. Dobronich's additional accounts with Citizens Savings Bank, created by Mr. Dobronich, seemingly correlating to the time in which Mr. Dobronich became estranged with Mr. Burdine. **(Ex. R. at 117.)** Also interesting is the subsequent involvement of "Craig" in this case on March 15, 2013. "Craig" is noted as contacting Mr. Romano and alerting him that "something was going on". **(Ex. R. at 175, ll.2-10.)** The St. Tammany Parish Hospital Records indicate that "Craig" also contacted the hospital on the same day requesting that Mr. Dobronich be tested for "vascular dementia". **(Ex. R. at 196.)**

authorization of Mr. Dobronich, there are some transactions that would arguably be difficult for Defendant, with self serving testimony, to explain without the testimony of Mr. Dobronich. These transactions included several transactions made out to "cash",[10] as well as a particular cashier's check from Capital One for $26,000.00, with "medical bills" written in the memo field, which was used to purchase a 2013 Nissan Altima, **(Ex. R. at 120)**. Despite only being within the cognizance of the Thibodauxs and Mr. Dobronich, Defendant maintains that all of these transactions were specifically authorized by Mr. Dobronich.

Detective Montgomery conducted three interviews with Mr. Dobronich during the course of his investigation, all of which occurred while Mr. Dobronich was in the hospital recovering from his broken hip. Although Det. Montgomery's interview summaries indicated contrary statements from Mr. Dobronich regarding his authorizations to conduct transactions on his behalf, the interviews also established that Mr. Dobronich was not comfortable accurately discussing his finances with Det. Montgomery. **(Ex. R. at 115-16.)**[11] Det. Montgomery conspicuously failed to determine the source of Mr. Dobronich's discomfort, or to obtain any statement specifically confirming or denying Mr. Dobronich's

---

[10] See footnote 4.

[11] Defendant notes that there are several discrepancies between the recorded interviews between Det. Montgomery and Mr. Dobronich that are unduly favorable to the Nephews. Defendant concedes that those recordings have not been introduced into evidence and are, admittedly, not properly before this Court. That being said, Det. Montgomery's notes themselves, and the evidence previously discussed, indicate that Mr. Dobronich was not forthcoming regarding his finances in that he purportedly told Det. Montgomery on March 18, 2013 that Mr. Romano handled "all my money". **(Ex. R. at 116.)** As indicated in the previous footnotes, this was not an accurate statement by Mr. Dobronich. **(Ex. R. at 115)**(noting that Mr. Romano would not transfer funds to the Citizens Bank account no. xxxxxx1994 because "the account was not set up by Mr. Dobronich."); **(but see Ex. R. at 344.)** An examination of the financial records of Mr. Dobronich should have lead Det. Montgomery to inquire further about Mr. Dobronich's concerns about discussing his financial arrangements. Sadly, this did not happen.

authorization as to any transactions made by defendant, or even to provide Mr.

Dobronich with the opportunity to do so.

Det. Montgomery was also initially provided with compelling evidence from

Mr. Romano that the statements of Mr. Dobronich were suspicious and potentially

coerced by the Nephews. Mr. Romano provided a statement to Det. Montgomery

noting that, at the time of Mr. Dobronich's conversation with Mr. Romano; Mr.

Dobronich's was in the presence of the Nephews in his hospital room after the

Nephews initiated the call to Mr. Romano:

> On March 5th 2013 [sic] I was contacted by Mr.
> Dobronich's relative from Washington (Craig), when
> Craig questioned me about the account I informed him
> that I could not give him any personal information, but if
> he knew of anyone to contact he should do so. Craig
> knew quite a bit about Mr. Dobronich's account, at one
> time the account was transferred to Washington and from
> what I understand Mr. Dobronich was living in
> Washington at the time and there were problems, Mr.
> Dobronich's account was transferred to us approx. two
> years ago. I knew there was a strained relationship
> between Mr. Dobronich and Craig, so I again told him to
> contact someone and he replied that he knew who the
> beneficiaries were supposed to be, I believe he said
> George and Forrest. On the afternoon of March 15th
> 2013 Craig called me back with one of the beneficiaries
> on the line also I told them that if they would have Mr.
> Dobronich call me that I would cancel trading authority
> for Mrs. Thibodaux. I gave them my cell number then
> asked what number they would be calling from so that I
> would recognize it. The next morning Saturday, March
> 16, 2013 I was contacted by Forrest, who was with Mr.
> Dobronich at the hospital, Forrest then put Mr.
> Dobronich on the phone and I received instructions to
> cancel Mrs. Thibodaux's trading authority, and not to
> take any other instructions from her.

**(Ex. R. at 255.)**

11

This evidence of coercion notwithstanding, Det. Montgomery had consistently maintained that, in his interviews with Mr. Dobronich, Mr. Dobronich was, at all times, alert and oriented. **(Ex. R. at 115, 122, 131.)** On March 18, 2013, Det. Montgomery obtained three signatures from Mr. Dobronich authorizing Det. Montgomery to access Mr. Dobronich's bank accounts and financial records. **(Ex. R. at 115, 139-141.)** Det. Montgomery also interviewed Mr. Dobronich on March 21, 2013 and April 2, 2013; again, noting Mr. Dobronich to be alert and oriented. **(Ex. R. at 122, 131.)**

Within this timeframe of Det. Montgomery's interviews with Mr. Dobronich, the Thibodauxs visited Mr. Dobronich in the hospital regarding his authorization of several monetary transactions conducted by the Thibodauxs with his expressed consent. That visit occurred on March 27, 2013, **(Ex. R. at 132)**, on the very same day and immediately after the St. Tammany Parish Sheriff's Office, along with agents of the United States Secret Service, conducted an armed raid, euphemistically characterized as a "search", of the Thibodaux residence, **(Ex. R. at 125-30)**,[12] during which time, Defendant was specifically told that Mr. Dobronich had reported to law enforcement that the transactions and purchases were not authorized. **(Ex. R. at 207.)**[13] That evening, at the request of the Defendant and

---

[12] As acknowledged by Det. Montgomery, TEN armed law enforcement agents (FOUR STPSO detectives, FOUR United States Secret Service Agents, and TWO uniformed STPSO deputies providing "perimeter security") deployed to the Thibodaux residence to secure evidence and to address the potential threats posed by Calvin and Darnay Thibodaux and their minor children. **(Ex. R. at 125.)**

[13] The statement by Det. Montgomery to Defendant that Mr. Dobronich reported that to law enforcement that the transactions were unauthorized, is omitted from Det. Montgomery's report, but is explicitly contained in the sworn statement of Special Agent Rick Rauch of the United States Secret Service, prepared in connection with a related Federal Civil Asset Forfeiture, which, in addition to this criminal matter and the Civil Revocation Action, Defendant has been forced to defend. **(Ex. R. at 207, ¶ 9)**("When advised that Mr. Dobronich stated that the purchases were unauthorized, she could not provide any further information.")

her husband, Mr. Dobronich executed an affidavit, which was hand written, but otherwise in proper form, explicitly stating that the transactions and the vehicles and equipment were purchased with his knowledge and authorization. **(Ex. R. at 132.)** Specifically, the March 27, 2013 affidavit of Mr. Dobronich provided as follows:

> State of Louisiana
>
> Parish of St. Tammany
>
> Before me, Rebecca D. Crawford, Notary Public, personally appeared:
>
> Sidney Dobronich
>
> who being first duly sworn, states that
>
> 1) He does not want to press charges against Calvin and/or Darnay Thibodaux for acting on his behalf with a Power of Attorney he executed in the presents [sic] of a Notary Public and two witnesses;
>
> 2) Anything purchased was with his consent and were authorized with his full knowledge;
>
> 3) Items such as, Kubota Tractor, a 4-wheeler, 2001 Chevy PK, a 2013 Nissan Altima and property(s) [sic] were purchased with my knowledge; the money came from my account;

**(Ex. R. at 228.)**

The very next day, on March 28, 2013, while in the hospital being treated for his fractured hip, Mr. Dobronich was visited by his Nephews and their civil attorney as well as other individuals. **(Ex. R. at 197-98.)** During that visit, Mr. Dobronich executed a fairly extensive power of attorney in favor of the Nephews. **(Ex. R. at 142-44.)** In addition to Forest and George Dobronich, this power of attorney was executed in front of three other individuals, including Ms. Peggy

13

Vallejo, attorney for the Nephews in the Civil Revocation Action and Mr. Leo R. Hemelt, Jr., who at that time was a high level official with the District Attorney's Office for the 22nd Judicial District. *Id.* As a result of this POA, the Nephews assumed custody of Mr. Dobronich from the time of his discharge from St. Tammany Parish Hospital inpatient rehabilitation on April 2, 2013, until his death on March 25, 2014. **(Ex. R. at 131, 184-90, 197-200, 298, ¶6.)** That power of attorney contained several detailed provisions similar to the February 14, 2013 power of attorney executed in favor of the Defendant (which coincidently was seized by Det. Montgomery in the March 27, 2013 search of Defendant's residence); including the right to "open and answer all correspondence," "deposit in and withdraw from any banks or financial institutions any and all funds, notes, certificates and financial institutions for accounts of [Mr. Dobronich]", "sue in [Mr. Dobronich's] name", "to compromise . . . any claims", to "make transactions in matters of litigation" and to "make health care decisions on [Mr. Dobronich's] behalf, including decisions related to surgery, medical expenses, nursing home residency, or medication." **(Ex. R. at 142-44.)** The March 28, 2013 power of attorney also included the following provision:

> It is the intent of PRINCIPAL in executing this mandate that said AGENT shall be empowered to act for PRINCIPAL in any and all matters, without reservation of any kind and to the fullest extent allowed by law, as completely as if PRINCIPAL were acting for herself [sic] and that said AGENT shall have full power of substitution herein and power of revocation of said substitution. PRINCIPAL further declares that he hereby revokes any and all prior Power of Attorney.

**(Ex. R. at 144.)**

14

Both the March 27, 2013 affidavit and the March 28, 2013 power of attorney

had been executed by the time Det. Montgomery conducted his third interview of

Mr. Dobronich on April 2, 2013.   While apparently attempting to discredit the

March 27, 2013 affidavit, Det. Montgomery made this startling statement:

> On April 2, 2013 at 0945 hrs Det. Montgomery and Det.
> Kristie Abadie met with Mr. Dobronich as he was
> preparing to be discharged from St. Tammany Parish
> Hospital. Mr. Dobronich stated he was feeling ok. He
> knew what day it was, who the president was, and he
> knew he was at St. Tammany Parish Hospital recovering
> from a hip injury.
>
> He remembered talking to Det. Montgomery but had
> some trouble recalling the details of why they had talked.
> **He recalled "signing something" recently but could
> not recall what it was.** . . .
>
> Det. Montgomery then spoke to Forest Dobronich, who
> was preparing to take him home and care for him, while
> he rehabilitated.   Forest Dobronich had secured joint
> power of attorney with Mr. Dobronich's other nephew,
> George Dobronich, through their civil attorney.

**(Ex. R. at 131.)**

With the March 28, 2013 power of attorney, the Nephews took complete and

unfettered physical custody of Mr. Dobronich, who was specifically taken to live

with his Nephew, Forest Dobronich.  **(Ex. R. at 131, 184-90, 197, 200, 298, ¶6.)**

Immediately after the April 2, 2013 interview with Mr. Dobronich; Det.

Montgomery interviewed Ms. Rebecca Crawford, the individual who notarized the

February 14, 2013 will and power of attorney and the March 27, 2013 affidavit.

**(Ex. R. at 131-32.)**   Det. Montgomery implicitly determined that Ms. Crawford

was a notary in good standing in the State of Louisiana (and was formerly a Justice

of the Peace in Pearl River).  **(Ex. R. at 131.)**  Det. Montgomery also admitted that

15

Ms. Crawford determined that Mr. Dobronich appeared competent at all times in which he executed any documents in her presence. **(Ex. R. at 132.)** Regarding the March 27, 2013 affidavit, Det. Montgomery reported that 1) Ms. Crawford had asked Mr. Dobronich if he would be willing to sign a statement, to which he affirmatively replied; 2) that Ms. Crawford had given the affidavit to Mr. Dobronich to read; 3) that Mr. Dobronich had read the affidavit; 4) that she read off the list of items to Mr. Dobronich and asked him if he consented to the purchases, to which he answered "yes"; and 5) that he had signed the affidavit. **(Ex. R. at 132.)**[14]

Mr. Dobronich was discharged from St. Tammany Parish Hospital on April 2, 2013. On April 5, 2013, the Thibodauxs were arrested for violations of La. R.S. 14:93.1, Exploitation of the Infirmed. **(Ex. R. at 138.)**

On April 17, 2013, The Nephews, on behalf of Mr. Dobronich as his agents in fact, instituted a civil action entitled *Forest Dobronich and George Dobronich v.*

---

[14] Subsequent to the interview with Ms. Crawford, Det. Montgomery's investigation focused intently on the purchase of property located at 26099 Ellis Drive. **(Ex. R. at 134-37.)** On March 13, 2013, Darnay Thibodaux purchased the property from Ms. Buffie Crawford Singletary for $45,000. The transaction constituted a sale, but was executed as a simulated donation. The circumstances and consequences of the law enforcement's reckless disregard for objectivity are disturbing. The efforts of the St. Tammany Parish Sheriff's Office and the United State's Secret Service were able to secure testimony on the part of Buffy Singletary that she had never met Mr. Sidney Dobronich, and evidence that Darnay Thibodaux was attempting to encourage her to advise law enforcement to the contrary. **(Ex. R. at 134.)** Whether Ms. Singletary did, or did not, meet Mr. Sidney Dobronich is debatable from the evidence. What is not debatable is the fact that simulated donations are not illegal. *See* **La. C.C. arts. 2027, 2028** (providing for the definition of "Relative Simulations" and their effects as between the parties and as between third persons.) What is also not debatable is the lack of relevance of such a meeting as to any attempt by the Thibodauxs to purportedly "conceal" the transaction from Mr. Dobronich, as evident from the March 11, 2013 cashier's check for $45,000, which plainly provides is for "Purchase of 29066 Ellis Drive". **(Ex. R. at 121.)** Defendant contends that Mr. Dobronich was fully aware of this transaction and specifically instructed Defendant to execute the transaction as a donation.

Despite the virtual non relevance of whether Ms. Singletary did, or did not meet Mr. Dobronich prior to the 29066 Ellis Drive transaction; there existed suspicious attention to such evidence by law enforcement. Prior to her "cooperation" with law enforcement, Ms. Singletary was greeted in a meeting with not only Det. Montgomery, but also with two agents from the United States Secret Service. **(Ex. R. at 134.)** She was advised of her Miranda rights, though it is not clear from the investigation the purpose of the rights advisement.

16

*Darnay Thibodaux and Calvin Thibodaux*, No. 2013-11784, 22nd J.D.C., Div. "D",

(hereinafter, "the Civil Revocation Action") seeking to revoke the February 2013

Last Will and Testament naming the Thibodauxs as beneficiaries of Mr.

Dobronich's estate. **(Ex. R. at 269-278.)**[15] The Nephews also moved for a writ of

sequestration on the property located at 29145 Nell Drive and 29066 Ellis Drive.

*Id.* Throughout the initial pendency of the Civil Revocation Action, Defendant

through her counsel at the time, vigorously sought to obtain a deposition of Mr.

Dobronich. These efforts were vigorously resisted by the Nephews. **(Ex. R. at**

**284, 285, 293-94, 295-301, 302-06.)**[16] Mr. Dobronich was not subject to anything

resembling a fair examination until June 25, 2013. Concurrently, the District

---

[15] The Civil Revocation Action was actually preceded by the filing of a petition for injunctive relief by the Nephews *Dobronich v. Thibodaux*, 22nd J.D.C., No. 2013-11468, Div "F" ("the Injunction Action"), filed on March 28, 2013, the very day of the wrongful execution of the Power of Attorney in favor of the Nephews. **(Ex. R. at 257.)** The Nephews requested a hearing date on a preliminary injunction set for April 10, 2013. *Id.* The Claimants, through counsel, filed a writ of habeas corpus set for that date, demanding the production of Mr. Dobronich for testimony. **(Ex. R. at 263-65.)** However, prior to that date, on April 5, 2013, the Nephews dismissed the Injunction Action, procedurally rendering moot the Writ of Habeas Corpus. **(Ex. R. at 268.)**

[16] On May 15, 2013, counsel for Claimants sought to set the deposition of Mr. Dobronich. **(Ex. R. at 284.)** By correspondence dated May 21, 2013, the Nephews refused and advised that they were moving for a restraining order against the Thibodauxs:

> Please be advised that my clients oppose any deposition of Mr. Dobronich outside of the court's presence and as well any contact whatsoever that the Thibodaux's [sic] attempt to have with Mr. Dobronich. Additionally, it is not certain that Mr. Dobronich's treating physician would clear him for a deposition in light of his medical problems. In that regard, please find enclosed a Motion for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction which has been filed into the record of the above matter.

**(Ex. R. at 285.)**

On May 23, 2013, Counsel for Claimants again sought to schedule the deposition of Mr. Dobronich, this time simply filing a Notice of Deposition with the Court, setting Mr. Dobronich's deposition for June 13, 2013. **(Ex. R. at 293-94.)** On June 10, 2013, counsel for the Nephews filed an *ex parte* motion to cancel Mr. Dobronich's deposition and to quash the deposition subpoena, which ex parte order was signed on that very day. **(Ex. R. at 295-301.)** On June 13, 2013, counsel for Claimants filed a motion seeking to direct the scheduling of Mr. Dobronich's deposition. **(Ex. R. at 302-06.)** That motion was set for June 25, 2013. *Id.*

Attorney filed a bill of information against the Defendant, *State v. Thibodaux*, No.

534840-1, 22nd J.D.C., Div. "C", and Defendant was arraigned on June 11, 2013.

From April 2, 2013, until the day of his testimony on June 25, 2013, Mr.

Dobronich had been under the exclusive physical custody and control of the

Nephews.   Not surprisingly, Mr. Dobronich's testified on direct examination

consistent with the Nephew's position that the transactions involving the

Thibodauxs were not authorized and that he wanted his "nephews and nieces and

all" to inherit his property.   **(Ex. R. at 107.)**   The March 28, 2013 power of

attorney in favor of the Nephews notwithstanding, Mr. Dobronich did testify on

direct examination that he took care of his money and he didn't want anyone else

(which presumably included his Nephews) to take care of his money. *Id.*

For the first time on cross examination on June 25, 2013, Mr. Dobronich

was confronted with specific documents that he had signed.   Although initially

stating that his signature was forged, upon continued confrontation with the

evidence, Mr. Sidney Dobronich unequivocally stated that he knowingly executed

the March 27, 2013 affidavit and had knowingly authorized the transactions noted

therein:

> Q.    Now, I want to show you an affidavit, sir, and this
> is an affidavit that I'm going to mark as Defense Exhibit
> Number 4.   Take your time and look at it, and it's dated
> March 27, 2013, affidavit, okay.   When you finish
> reading just acknowledge your head, okay, please.   Are
> you finished reading it?
> A.    Uhm-hum (Affirmative response).
> Q.    Would you look at the bottom of it.   Do you
> remember I pointed out Mrs. Crawford.   Do you know
> Rebecca Crawford?
> A.    Yeah.
> Q.    Is that her name on the bottom of it?
> A.    It is.

> Q.     And is that your signature on the bottom of it?
> A.     Yeah.
> Q.     And without going into it, it says - - and we're
> going to go into it - - that you gave her the power of
> attorney to buy a Kubota tractor, a four-wheeler, a 2001
> Chevy pickup, a Nissan, other property with your full
> knowledge and with your account and with your consent
> with your money from your account.  Does it say that?
> And you do not wish to pursue these people for criminal
> charges.  It says what it says; does it not, sir?  Yes?
> A.     Yeah.
> Q.     And whose signature is on the bottom of that
> affidavit?  Is that your signature on the bottom?
> A.     Yeah.

**(Ex. R. at 222, l.27-223, l.23.)**

So as to be certain that Mr. Dobronich was clear on what he was saying, the

Court reiterated questioning on this point, to which Mr. Dobronich unequivocally

confirmed his consent and authorization:

> BY THE COURT:
>        Wait.  I have a question, Mr. Burns.
> BY MR. BURNS:
>        Yes, sir, surely.
> BY THE COURT:
>        Why did you do this?  Did somebody ask you to
> do this?
> BY THE WITNESS:
>        I don't know.
> BY THE COURT:
>        You don't know why you did this?  You don't
> remember who asked you to do it?
> BY THE WITNESS:
>        (Negative Response).
> BY THE COURT:
>        Was it your idea?  You came up with this by
> yourself?
> BY THE WITNESS:
>        (Affirmative Response)
> BY THE COURT:
>        You called up Ms. Crawford and said I want to do
> an affidavit?
> BY THE WITNESS:
>        Yeah.

19

BY THE COURT:
　　　You called her up?  Ms. Crawford is right there.
You called her up and said I want to do an affidavit and
say that everything I did I don't want to prosecute them
for and I want to give this to them?  You called them up
and said that?  It was your idea?
BY THE WITNESS:
　　　(Affirmative response).

**(Ex. R. at 224, l.11-225, l.29.)**

Cross examination continued, and Defendant's counsel began to secure

additional favorable testimony from Mr. Dobronich.  **(Ex. R. at 226.)**  However,

Defendant's counsel was interrupted by the Court, whereby the Court conducted

the following inquiry and determined Mr. Dobronich incompetent to testify at that

time:

BY THE COURT:
　　　Let me stop you right there, Mr. Dobronich, look
at me.  What are we doing here right now.
BY THE WITNESS:
　　　Huh?
BY THE COURT:
　　　What are we doing right here in this courtroom
right now?
BY THE WITNESS:
　　　In court.
BY THE COURT:
　　　Why are we here?
BY THE WITNESS:
　　　Why am I here?  I don't know.
BY THE COURT:
　　　What am I doing here?  What am I supposed to
do?  Do you know what my role is and what I'm
supposed to be doing?  What?  You're just nodding yes.
All right.  You can step down.  You can step down.
　　　Based on my observation of this gentleman on the
stand, I do not think he is competent to testify.  Call your
next witness.

**(Ex. R. at 227, ll. 10-29.)**

Subsequent to the hearing on June 25, 2013; the Nephews, as the agents in fact of Mr. Dobronich, in a lawsuit they instituted on his behalf; sought to secure a judgment declaring him mentally incompetent.  On July 9, 2013, the Nephews submitted a medical report of Dr. Paul Verrette to the Court in the Civil Revocation Action.  That report stated, in pertinent part:

> Mr. Dobronich was evaluated on July 2, 2013.  He has multiple medical problems which include, hypertension, hypertensive cardiovascular disease, coronary artery disease, s/p coronary artery stent, osteoarthritis with total hip replacement of the left hip, chronic renal insufficiency and dementia.  Dementia is likely due to his history of hypertension and cerebrovascular disease.  His dementia is such that he is not able to direct his affairs concerning person or property in matters consistent with his own interest.

**(Ex. R. at 146-47.)**

This report notwithstanding, counsel for Defendant continued to persist with obtaining a deposition of Mr. Dobronich.  **(Ex. R. at 312.)**  On July 17, 2013, counsel in the Civil Revocation Action held a status conference with the Court, which counsel for Nephews summarized as follows:

> This is to confirm my conversation with you during the Status Conference with Judge Garcia wherein I informed you and the judge that we oppose the setting of Sidney Dobronich's deposition based on his incompetency and dementia.  As a result of that information, Judge Garcia has set this matter on the docket for August 27, 2013.

**(Ex. R. at 313.)**

In response to repeated requests to the Nephews and the Court to have Mr. Dobronich submit to a deposition, the Nephews, on August 13, 2013, submitted a follow up letter from Dr. Verrette, dated July 25, 2013, not only stating that Mr. Dobronich was not competent to handle his affairs, but also "that [Mr. Dobronich]

21

is not mentally stable enough to be able to provide any competent testimony in a court of law, including a deposition." **(Ex. R. at 317-18.)**

During the time in which the Nephews were working to have Mr. Dobronich declared incompetent; the prosecution was assumed by the Louisiana Attorney General's office.  A bill of information was re-filed by the Attorney General's Office as *State v. Thibodaux*, No. 538643-1, 22nd J.D.C., Div. "C"("the Criminal Proceedings"). **(Ex. R. at 1.)**

On August 27, 2013, the Court in the Civil Revocation Action issued a judgment declaring Mr. Dobronich incompetent to testify in the Civil Revocation Action. **(Ex. R. at 145.)**  Based on that ruling, the Prosecution and Defense, on December 12, 2013, entered into a stipulation that Mr. Dobronich would not testify in the Criminal Proceedings. **(Ex. R. at 349.)**

Mr. Dobronich passed away on March 24, 2014. **(Ex. R. at 157.)**

Following the death of Mr. Dobronich, on August 6, 2014, the Nephews, Forest and George Dobronich, along with several other purported nieces and nephews, opened a succession: *Succession of Dobronich*, No. 2014-30680, 22nd J.D.C., Div "I" ("the Succession"), **(Ex. R. at 157)**; in which the Nephews submitted an affidavit, dated July 16, 2014, probating a purported olographic testament of Mr. Dobronich, **(Ex. R. at 150).**  The purported olographic testament was written on what appeared to be a sheet of looseleaf notebook paper, was illegible in several areas, and the date of the purported instrument was inconsistently written.  **(Ex. R. at 148.)**  The affidavit for probate provided in pertinent part:

> BEFORE    ME,    the    undersigned    authority
> personally came and appeared:
>
> FOREST DOBRONICH and GEORGE DOBRONICH
>
> Both persons of the full age of majority, who, after
> first being duly sworn, did depose and state:
>
> That Affiants are the surviving nephews of the late
> SIDNEY DOBRONICH
>
> That affiants are familiar with the handwriting of
> SIDNEY DOBRONICH and that Affiants have reviewed
> the Last Will and Testament dated July 18, 2013, which
> appears on one sheet of paper beginning with the words,
> "I, SIDNEY DOBRONICH, being of sound mine &
> body" and ending in the words "would like to leave all
> my possessions at the time of mine of my death to all my
> nieces and nephews to be divided equally."

**(Ex. R. at 150.)**

This purported olographic testament, purportedly dated on July 18, 2013, is

bracketed by the Nephews July 9, 2013 and August 13, 2013 submissions to the

Court in the Civil Revocation Action regarding Mr. Dobronich's ability to "direct

has affairs concerning person or property in matters consistent with his own

interest." **(Ex. R. at 146-47, 320-21.)** The July 18, 2013 date is one day after the

acknowledgement of the status conference by the Nephew's attorney in the civil

action noting the Nephews opposition to the setting of a deposition of Mr.

Dobronich "based on his incompetency and dementia." **(Ex. R. at 318.)**

On August 29, 2014, the State tendered to defense an expert report of Dr.

Michelle Garriga regarding a forensic psychiatric analysis of Mr. Sidney

Dobronich. **(Ex. R. at 94-112.)** This analysis was conducted reviewing hospital

records for Mr. Dobronich corresponding with hospital visits from February 10

through February 14, 2013 for a heart attack and March 12 through March 15,

23

2013 records for treatment for a fractured hip; the investigation report from Detective Stefan Montgomery of the St. Tammany Parish Sheriff's Office; the transcript of proceedings in the Civil Revocation Action containing testimony of Mr. Joe Romano; Det. Montgomery; and Mr. Sidney Dobronich; the February 2013 will and power of attorney; and that medical records of Dr. Verrette. *Id.* The report concluded that "to a reasonable degree of medical certainty that Mr. Dobronich suffered from Major Neurocognitive Disorder (Dementia), Possible Vascular Neurocognitive Disorder prior to February of 2013 and up until his death." **(Ex. R. at 111.)** The analysis primarily relied on the evaluation of Dr. Verrette, as well as the statements of the Nephews regarding Mr. Dobronich's spending habits prior to February of 2013. **(Ex. R. at 112.)**

This analysis clearly did not consider the March 28, 2013 power of attorney executed in favor of the Nephews; Mr. Dobronich's purported July 18, 2013 olographic will and the Nephews' attempt to probate same in August of 2014. Furthermore, Dr. Garriga did not consider the evidence of the financial arrangements between Mr. Dobronich and his estranged step grandson, Mr. Craig Burdine, though she did note Mr. Burdine's attempt to have Mr. Dobronich tested for "vascular dementia" on March 15, 2013, **(Ex. R. at 98)**. Dr. Garriga also apparently disregarded the authorizations, signed by Mr. Dobronich and obtained by Det. Montgomery, **(Ex. R. at 5-6.),**[17] that were necessary for Det. Montgomery to obtain Mr. Dobronich's financial records as well as the portion of Mr. Romano's testimony in which he recounted that Mr. Dobronich withdrew his entire portfolio

---

[17] Dr. Garriga conspicuously avoids this inconvenient fact, noting that "Financial Transactions as uncovered and chronicled per investigative efforts." *Id.*

24

from Romano Investments in 2009, **(Ex. R. at 103)**.[18]    Finally, Dr. Garriga

completely ignored medical records of Dr. Lawrence McManus, which stated

unequivocally that Mr. Dobronich "ha[d] decision making capacity." **(Ex. R. at**

**180.)**

On November 8, 2014; Defendant herein and her husband filed a petition to

annul the July 18, 2013 olographic testimony of Mr. Dobronich. **(Ex. R. at 18-29.)**

Although the Defendants asserted a lack of mental capacity as grounds for

annulment, the primary basis for annulment was lack of consent due to duress.

The hearing on the petition was set for January 27, 2015. **(Ex. R. at 20.)**[19]

On November 10, 2014, the State of Louisiana tendered to defense *Brady*

material regarding the July 18, 2013 purported testament of Mr. Dobronich, the

State's tender and notice provide, in pertinent part:

> The state is hereby providing exculpatory evidence
> it has received in connection with this case complying
> with *Brady v. Maryland*, 371 U.S. 812, 83 S. Ct. 56, 9 L.
> Ed. 2d 54 (1962). I received this document November 7,
> 2014. Please find the attached copy of a DVD depicting
> Mr. Sidney Dobronich dictating a will on July 18, 2013.
> The video was taken by Forest Dobronich.

**(Ex. R. at 191.)**[20]

On December 2, 2014, the State of Louisiana provided another tender of

*Brady* material to defense, involving "copies of a check register from an account

that Forest Dobronich had used to support Sidney Dobronich." **(Ex. R. at 184-90.)**

Furthermore, from that time, the nephews engaged in several financial transactions

---

[18] The inconvenient fact that Mr. Dobronich withdrew all his investments in 2009 is also
conspicuously marginalized: "He indicated that Mr. Dobronich was one of his clients from
2004-2009, he moved away, and upon his return in 2011 moved all of his investments (mostly
bonds) back to Mr. Romano. *Id.*
[19] The hearing was continued to February 24, 2015.
[20]The videos were not made part of the record of the proceedings.

25

involving Mr. Dobronich's finances. *Id.* The check register chronicles transactions by Forest Dobronich beginning in April 2, 2013 through February 2, 2014 (well after the Nephew's July 9, 2013 submission to the Court in the Civil Revocation Action regarding Mr. Dobronich's ability "to direct his affairs concerning person or property in matters consistent with his own interests"). These transactions included 7 payments to the nephew's personal civilian attorney, Ms. Vallejo (the notary on the March 28 Power of Attorney), totaling $28,627.58[21]; and also included making 18 payments to themselves totaling approximately $17,628.53 (3 payments to "cash" in the amount of $5,100.00[22] and 15 payments to Forest Dobronich for various items such as fees for "sitter" totaling $12,528.53[23]).

*Id.*

---

[21] Payments to the nephews' personal civilian attorney are broken down as follows:

| | | | |
|---|---|---|---|
| 1) CHK # 104 | 4/24 | Vallejo Law Firm | $4,480.00; |
| 2) CHK # 122 | 5/26 | Vallejo Law Firm | $467.31; |
| 3) CHK # 126 | ? | Vallejo Law Firm | $5,461.97; |
| 4) CHK # 142 | 8/13 | Vallejo Law Firm | $11,534.20; |
| 5) CHK # 147 | 9/15 | Vallejo Law Firm | $2,474.10; |
| 6) CHK # 152 | 12/10 | Vallejo Law Firm | $2,660.00; |
| 7) CHK # 160 | 2/10 | Vallejo Law Firm | $1,550.00; |
| | | **Total:** | **$28,627.58.** |

[22] Payments to "cash" are broken down as follows:

| | | | |
|---|---|---|---|
| 1) CHK # 148 | 9/16 | Cash | $2,000.00; |
| 2) CHK # 149 | 9/30 | Cash | $1,200.00; |
| 3) CHK # 151 | 10/26 | Cash | $1,900.00; |
| | | **Total:** | **$5,100.00.** |

[23] Payments to the nephew, Forest Dobronich, are broken down as follows:

| | | | |
|---|---|---|---|
| 1) CHK # 113 | 4/2 | Forest Dobronich | $232.92 (2 days sit, groceries and pharmacy); |
| 2) CHK # 116 | 5/5 | Forest Dobronich | $200.00 (2 days sit, groceries); |
| 3) CHK # 121 | 5/25 | Forest Dobronich | $995.00 (7 days sitter, groceries and pharmacy); |
| 4) CHK # 124 | 6/7 | Forest Dobronich | $500.00 ??; |
| 5) CHK # 125 | 6/9 | Forest Dobronich | $547.00 (7 days sitter and groceries); |
| 6) CHK # 127 | 6/14 | Forest Dobronich | $492.00 (7 days sitter, pharmacy, groceries); |
| 7) CHK # 128 | 6/21 | Forest Dobronich | $505.00 (7 days sitter, groceries and pharmacy); |
| 8) CHK # 134 | 7/12 | Forest Dobronich | $896.61 (sit, video camera, groceries and pharmacy); |
| 9) CHK # 136 | 7/21 | Forest Dobronich | $500.00 (5 days sit, $100 per day); |
| 10) CHK # 140 | 8/1 | Forest Dobronich | $800.00 (7 days sit, supplies); |
| 11) CHK # 141 | 8/11 | Forest Dobronich | $800.00 ("8-5-13 thru 8-11-13")); |

On December 3, 2014, undersigned counsel enrolled as counsel of record in the Criminal Proceedings. **(Ex. R. at 2, 36.)** At that time, undersigned counsel filed a motion to exclude the testimony of Dr. Garriga, based on a violation of Louisiana Rules of Evidence Rule 702 (*Daubert*). **(Ex. R. at 37-38.)**

Trial of this matter was set for December 15, 2014. Prior to trial, the Prosecution advised the Defense of its intent to file a multiple offender bill against Defendant.[24] The Prosecution also indicated a willingness to accept a plea agreement for 5 years suspended sentence, 5 years probation, reimbursement for expert fees, a reservation of a right to hold a restitution hearing.

On December 16, 2014, a hearing on the Defense Motion to Exclude Expert Testimony was held. During the examination, Dr. Garriga admitted that the medical records evaluations indicated that, in several instances, Mr. Dobronich obtained the highest score possible on several cognitive evaluations. Dr. Garriga also admitted that no test was performed, either by St. Tammany Parish Hospital personnel nor by Dr. Verrette, that would differentiate between long term dementia and short term intoxication due to ingestion of narcotics (as for surgery). Despite these admissions, the Court denied Defense's Motion to Exclude Dr. Garriga's testimony.[25]

---

| | | | |
|---|---|---|---|
| 12) CHK # ?? | 8/17 | Forest Dobronich | $960.00 (7 days sit, Dr. Verrette, haircut); |
| 13) CHK # 144 | ?? | Forest Dobronich | $800.00 (7 days sit, groceries); |
| 14) CHK # 150 | 10/3 | Forest Dobronich | $2,000.00 ??; |
| 15) CHK # 158 | 1/10 | Forest Dobronich | $2,300.00 ("Dale, wheelchair ramp"); |
| | | **Total:** | **$12,528.53** |

[24] Defendant had previously pled guilty in 2001 to a violation of La. R.S. 14:70.4, Access Device Fraud, the guilty plea was entered pursuant to La. C. Cr. P. 893.
[25] Undersigned counsel has not yet obtained the transcript of the December 16, 2014 hearing on the Motion to Exclude Expert Testimony and will supplement the record with the transcript once obtained.

Trial commenced on December 16, 2014. Despite substantial weaknesses in several aspects of the case, the prosecution still had the 30 plus transaction for over $330,000 that were performed within a one month time period. Likewise, as mentioned above, the authorizations as to several transactions were within the specific cognizance of only the Thibodauxs and Mr. Dobronich. By virtue of his being in the exclusive custody of the Nephews as of April 2, 2013; being declared incompetent to testify as of August 27, 2013 and his passing on March 25, 2014; Mr. Dobronich was not available to testify on behalf of the Defense.

A finding that just one of the over 30 plus transactions was performed either "without the express voluntary consent" of Mr. Dobronich, or was performed by use of a power of attorney for personal gain by means of fraud, would have been sufficient to support a finding of guilty to the charged offenses.

On December 17, 2014, Defendant Calvin Thibodaux, agreed to plead guilty as charged for the plea deal offered by the State of Louisiana. (**Ex. R. at 355.**)[26] Defendant herein also pled guilty as charged. (**Ex. R. at 356.**) The prosecution, while agreeing to a sentence of probation for Calvin Thibodaux, insisted on a pre-sentence investigation, in order to accommodate the wishes of the Nephews, who insisted on being able to provide "victim-impact" statements for consideration in the Court's sentencing of Defendant. *Id.* The Court herein conducted a rights advisement under *Boykin v. Alabama*, which sufficiently advised Defendant of her constitutional rights. *Id.* The Court set the sentencing hearing for January 29, 2015. *Id.*

---

[26] Calvin Thibodaux has chosen not to join in the Motion to Withdraw Plea at this time due to fear that he will lose his sentence of probation and end up with incarceration.

28

Not having Mr. Dobronich available to testify on her behalf, the Defendant entered a knowing and intelligent plea of guilty on December 17, 2014. However, the guilty plea was based in substantial part on the unavailability of Mr. Dobronich to provide exculpatory testimony to his express and unequivocal authorization as to all of the 30 plus transactions performed between February and March of 2013.

On January 8, 2015, pursuant to the pre-sentence investigation, Defendant submitted to an interview with an agent with the Department of Corrections.[27] The agent demanded specific admissions from the Defendant that the expenditures were unauthorized. The Defendant refused to provide the admissions, maintained that she was innocent, and she would be withdrawing her guilty plea. On January 9, 2015, Defendant herein filed a Motion to withdraw her guilty plea and to dismiss the indictment on the grounds that the Nephews, in coordination with the State of Louisiana, deprived her of Mr. Dobronich's favorable testimony in violation of the Compulsory Process Clause of the 6th Amendment and the Due Process Clause of the 5th and 14th Amendments to the United States Constitution. **(Ex. R. at 49-64.)** The hearing on the Motions was set contemporaneously with the sentencing hearing on January 29, 2015. *Id.*

On January 22, 2015, the State of Louisiana filed an opposition to Defendant's Motion to Withdraw Plea and Motion to Dismiss Indictment. **(Ex. R. at 346-351.)** In opposing the Defendant's Motions, the State argued that it was speculative to assert that Mr. Dobronich's testimony would have been favorable to defense; that, while acknowledging the fraudulent conduct of the Nephews, the State was not involved in said conduct, and that there was significant evidence of

---

[27] See Footnote 29, *infra.*

Defendant's guilt. *Id.* While accusing undersigned counsel of asserting positions that are "untruthful" and "speculative", the state of Louisiana did not contest the authenticity and accuracy of the underlying evidence, the 26 page report of Det. Montgomery, the financial records authorizations obtained by Det. Montgomery from Mr. Dobronich, the March 28, 2013 power of attorney in favor of the Nephews, the August 27, 2013 Judgment in the Civil Revocation action, or the July 15, 2014 Affidavit of Probate executed by the Nephews. Additionally, the State of Louisiana, in acknowledging the fraudulent conduct of the Nephews and disavowing State involvement in same, admitted that it was made aware of such conduct on September 10, 2014. **(Ex. R. at 348, ¶2.)**[28] This acknowledgment and

---

[28] The State of Louisiana, in its brief to the District Court, made the following statement:

> The defense makes an egregious misrepresentation on page 12 of his motion when he states:
>
> > The constitutional violation was further aggravated when the Nephews, again with approving support from Detective Montgomery and the prosecution, committed outright fraud on both Division "D" and Division "I" of the 22nd Judicial District Court by providing evidence as to Mr. Dobronich's mental incapacity to testify to the former . . . .
>
> There are no pleadings whatsoever in divisions "D" or "I" of the 22nd Judicial District Court filed by the undersigned Assistant Attorney General. Furthermore, the undersigned had no knowledge whatsoever that Mr. Dobronich's succession had been opened until informed of this by Assistant U.S. Attorney Andre Legarde and Roy Burns via mail (See Exhibit 3 for Roy Burn's letter dated September 10, 2014). Also, as stated in the paragraph above, Judge Garcia signed the order declaring Mr. Dobronich incompetent to testify based on Dr. Paul Verrette's assessment dated in a letter dated July 25, 2013. The State affirmatively states that it had nothing to do with the opening of Mr. Dobronich's succession.

**(Ex. R. at 348.)** Undersigned counsel has no reason to doubt the sincerity of counsel for the State of Louisiana when he asserts that he had no involvement in the egregious conduct of the purported "victims", and professionally regrets any offense taken by opposing counsel for the assertions made by undersigned counsel herein. That being said, as will be discussed *infra*, the personal involvement of counsel for the State in the conduct, or lack thereof, is completely

disavowal notwithstanding, despite being made aware of same on September 10, 2014, the State continued to rely on the position espoused by Dr. Garriga regarding Mr. Dobronich's competence, or lack thereof, while at the same time taking the position that it sought restitution for the "victims", the Nephews. **(Ex. R. at 360.)**

Finally, the State of Louisiana underscored the importance of Mr. Dobronich's testimony, noting that "the investigation revealed that the defendants jointly spent over $300,000 of Mr. Sidney Dobronich's money within a little over a month from February through March of 2013." **(Ex. R. at 350, ¶4.)** Similarly, the State, while implicitly admitting the authenticity and accuracy of the March 27, 2013 affidavit of Mr. Dobronich and explicitly admitting that he signed it, characterized it as "misleading" and noted that "the defendants did not list all the many withdrawals made from his accounts." **(Ex. R. at 351, ¶4.)** Other than the assertion that the affidavit was "misleading", the Defendant does not dispute the aforementioned assertions of the State, which underscore the critical need for Mr. Dobronich's testimony.

The aforementioned evidence notwithstanding, the District Court denied the Motions to Withdraw Plea and to Dismiss the Indictment, finding that Mr. Dobronich had been declared incompetent, that he would not have offered any testimony favorable to the Defendant and that the State of Louisiana was not at fault in his unavailability to testify. **(Ex. R. at 360.)**

Sentencing followed. On or about January 29, 2015, the Department of Corrections submitted its Pre-Sentence Investigation Report ("PSIR") to the District Court for sentencing consideration. The PSIR was unduly disparaging

---

irrelevant to the culpability of the State of Louisiana for the Compulsory Process Clause and Due Process Clause violations noted herein.

towards the Defendant, presumably due to her refusal to provide admissions that the specific transactions were not authorized by Mr. Dobronich.[29]   The PSIR noted that Defendant was asked specifically for admissions regarding the purchase of a tractor and the 2013 Nissan Altima.   The PSIR noted Defendant's attempts to challenge the Nephew's claim to Mr. Dobronich's heirship by challenging the purported July 18, 2013 olographic testament.   Despite the fact that the bill of information alleged only 2 counts of a violation of La. R.S. 14.93.4 with no allegations of specific transactions or amounts involved, **(Ex. R. at 1)**, despite the fact that only one of the over 30 transactions investigated was sufficient to support a finding of guilty as to both counts, and despite the fact that Defendant refused to acquiesce in the Probation Officer's demands for admissions as to the specific transactions; in a section entitled "Recommendations", the PSIR apparently "found" Defendant guilty as to all 30 plus transactions and as to the entire $334,000 that was involved.   Additionally, the PSIR not only wrongfully failed to credit Defendant for payment of Mr. Dobronich's medical bills; but also wrongfully attributed a medical bill, which had come due during the Nephew's power of attorney, to the Defendant.[30]   The PSIR also "found" as follows:

---

[29] The Pre-Sentence Investigation Report is Not Included in the Exhibits presented to this Court. Defendant, on January 30, 2015, Defendant filed a motion seeking production of the PSIR after an in camera review to redact any confidential materials contained therein under La. R.S. 15:574.12, *et seq.*   On February 5, 2015, the District Court conditionally granted the motion, admonishing the Defendant not to release the report "to any other party without Court approval." **(Ex. R. at 368.)**   Undersigned counsel believes that inclusion of the report with the exhibits could result in a violation of the District Court's order.   As such, Defendant has filed a motion with this Court for production of the PSIR directly to this Court for in camera review and necessary consideration with this writ application.

[30] The PSIR, presumably drawing upon Det. Montgomery's investigation, noted that "Thibodaux stated that the money she took from Dobronich was to pay his medical bills."   The report also states that:

> Thibodaux connived and swindled an eighty-five (85) year old person out of his life savings and retirement. She attempted to deprive Dobronich's rightful airs [sic] to their inheritance.

The PSIR also contained a striking statement by Mr. Forest Dobronich, who admitted that he was requesting the State pursue confinement due to Defendant's challenge to the Nephew's claim to heirship of Mr. Dobronich's estate by virtue of the July 18, 2013 olographic testament and her desire to assert her own claims of heirship and to property donated by Mr. Dobronich. The PSIR recommended a sentence of 10 years with 3 years suspended. The Court sentenced Defendant to 10 years in prison with 5 years suspended, and 5 years probation.

Despite not only acknowledging, but specifically disavowing the Nephews fraudulent conduct in attempting to probate a purported July 18, 2013 olographic testament of Mr. Dobronich, executed during the timeframe when the Nephews

---

> Contact was made with the billing department of the Kidney & Hypertension Associates in Covington, LA and was informed Dobronich has an unpaid balance of $1,054.70 for services rendered dating back to 03/18/13. Due to Hippa Regulations, information regarding account balances with any hospitals in St. Tammany Parish could not be obtained.

As to the $1,054.70 balance from the Kidney & Hypertension Associates, a bill for services rendered on March 18, 2013, would have presumably come due 30 days after, assuming the invoice was dated at that time. As of March 28, 2013, the Nephews, by virtue of their "lawfully obtained" power of attorney from a "fully competent" Mr. Dobronich, would have assumed de facto responsibility for any and all medical bills that came due after that time. Likewise, the PSIR's assertion that account balances with any other hospitals in St. Tammany Parish could not be obtained due to "Hippa Regulations" is patently false. As noted in his report, Det. Montgomery, on April 2, 2013, specifically obtained "written permission from Forest Dobronich to obtain any medical or billing records that were needed for the investigation." (**Ex. R. at 131.**) As with the March 18, 2013 signed authorizations used to obtain Mr. Dobronich's bank records, the "validity" of the March 28, 2013 power of attorney would have provided Det. Montgomery with access to any medical bills that were outstanding between February 14, 2013 and March 28, 2013. Det. Montgomery's investigation is obviously devoid of any such evidence. The PSIR's attempt to blame "Hippa Regulations" for the absence of any evidence that the Defendant failed to pay Mr. Dobronich's medical bills maliciously obscures potentially mitigating evidence that Defendant paid Mr. Dobronich's medical bills and is yet another example of the State's insidious and arbitrary attempts to rely on evidence only when it benefits the Nephews and/or harms the Defendant.

33

sought to have Mr. Dobronich declared incompetent to testify; the State of Louisiana continued to assert the position that the Nephews were entitled to restitution. **(Ex. R. at 348, 360.)** The Court accepted this assertion, and ordered restitution as part of the Defendant's sentence, further ordering a restitution hearing to be set at some time in the future.

The Defendant filed a Motion to Stay the Execution of Sentence pending application for supervisory review, which the District Court denied. **(Ex. R. at 362-65.)**

This writ application follows.

As more fully discussed below, the Defense submits that, but for the actions of the Nephews in coercing his statements and testimony, as well committing fraud upon the Court in the Civil Revocation Action in having him declared incompetent to testify, as well as the willful and reckless disregard exhibited by Det. Montgomery in greatly facilitating the coercive conduct of the Nephews and of the fraud committed upon the Court; Mr. Dobronich would have been available and would have unequivocally testified in the Thibodauxs' favor. As such, the Thibodauxs' right to compel his production under the Compulsory Process Clause of the 6th Amendment had been violated and, under the circumstances, such violation impermissibly infected the voluntariness of the guilty plea entered on December 17, 2014. Furthermore, because of the passing of Mr. Dobronich, this violation cannot be cured upon the grant of a new trial: dismissal of the indictment is the only available remedy for this violation.

## ISSUE TO BE CONSIDERED

(1) Did the District Court Err in Failing to Find a Violation of the Compulsory Process Clause of the Sixth Amendment and a Violation of the Due Process Clause of the Fourteenth Amendment, leading to a Denial of the Motion to Withdraw Plea and Motion to Dismiss Indictment?

# SPECIFICATION OF ERROR

(1) The District Court Erred in Failing to Find a Violation of the Compulsory Process Clause of the Sixth Amendment and a Violation of the Due Process Clause of the Fourteenth Amendment, leading to a Denial of the Motion to Withdraw Plea and Motion to Dismiss Indictment.

## ARGUMENT

**(1)**     **The District Court Erred in Failing to Find a Violation of the Compulsory Process Clause of the Sixth Amendment and a Violation of the Due Process Clause of the Fourteenth Amendment, leading to an Erroneous Denial of the Defendant's Motion to Withdraw Plea and Motion to Dismiss Indictment.**

From an analytical standpoint, this case presents a very complex issue regarding a violation of the Compulsory Process Clause in two respects, 1) at the time the Defendant requested the Court consider the issue, the witness was deceased and was not "available" in any sense; and 2) the witness was not merely a favorable witness for the Defendant, but, as the "victim" of the alleged crime of Defendant, was a dispositive witness for the State, whose favorable testimony for Defendant effectively eliminated the State's prosecution of Defendant.   In that respect, this issue can also be analyzed within the framework of whether, as a matter of Due Process, 1) from March 18, 2013 through his death on March 24, 2014, the Defendant was deprived of the opportunity to secure favorable testimony from Mr. Dobronich and, 2) the State should have been permitted to resuscitate its prosecution with post mortem expert testimony of Mr. Dobronich's capacity to consent to any transactions during the timeframes at issue.  This is so especially in light of the uncontroverted fact that the State's own expert testimony undercuts its own investigation and its assertion that the Nephews are entitled to restitution from the Defendant.  Defense submits that, at its core, Compulsory Process Clause analysis is appropriate and, regardless of the framework, egregious violations of the Compulsory Process Clause and the Due Process Clause have occurred in this case. The *Boykin* colloquy notwithstanding, those violations render the December 17, 2014 guilty plea constitutionally defective, require the District Court to allow

38

Defendant to withdraw her guilty plea and further require the District Court to dismiss this indictment.

**a) Standard of Review:**

A trial court may permit the withdrawal of a guilty plea at any time before sentencing. La. C. Cr. P. art. 559(A); *State v. Boudreaux*, 616 So. 2d 733, 736 (La. App. 1 Cir. 1993). Under this rule, a defendant has no absolute right to withdraw a previously entered plea, and the court's decision to permit withdrawal is discretionary. *State v. Lewis*, 633 So. 2d 315, 317 (La. App. 1 Cir. 1993); *Boudreaux*, 616 So. 2d at 736.

In ruling on a motion to withdraw a guilty plea, a trial court is not limited to a review of the guilty plea colloquy; it may also order an evidentiary hearing. *Lewis*, 633 So. 2d at 317. When ruling on a motion to withdraw a guilty plea, the district court should look beyond the *Boykinization* and consider all relevant factors, such as the breach of the plea bargain, inducement, misleading advice of counsel, strength of the evidence of guilt or the like. *State v. Stewart*, 47,679, p.6 (La. App. 2 Cir. 1/16/13), 109 So. 3d 915, 919.

Similarly, whether before or after sentencing, if a trial court finds that the plea is constitutionally infirm, either because the plea is not knowingly and voluntarily given or the *Boykin* colloquy was inadequate, the trial court has the authority to set aside the plea. *State v. Hayes*, 423 So. 2d 1111, 1112 (La. 1982); *Boudreaux*, 616 So. 2d at 736. When the record establishes that an accused was informed of and waived his right to trial by jury, to confront his accusers, to compel witnesses to testify in his favor, the burden shifts to the accused to prove that, despite this record, the guilty plea was involuntary. *State v. Wynne*, 40,921

39

(La. App. 2 Cir. 4/12/06), 926 So. 2d 789, 793.   That being said, an otherwise proper advisement of the rights notwithstanding, a guilty plea that would not have been made but for a violation of one or more of those rights cannot be determined to have been voluntary.  *See Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709 (1969).

The trial court's decision to allow for withdrawal of a guilty plea is discretionary, subject to reversal only if that discretion is abused or arbitrarily exercised.  *State v. Lewis*, 633 So. 2d 315, 317 (La. App. 1 Cir. 1993); *State v. Carmouche*, 589 So. 2d 53, 55 (La. App. 1 Cir. 1991).  Regarding the Motion to Dismiss, the standard of review for Motions to Suppress regarding similar constitutional violations has been provided by the Louisiana Supreme Court in *State v. Thompson*, 2011-0915 (La. 5/8/12), 93 So. 3d 553:

> The trial court's ruling on the matter must be afforded great weight and will not be set aside unless there is an abuse of discretion.
>
> The analysis may be further broken down into the component parts of the trial court decision. "When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings." Legal findings or conclusions of the trial court are reviewed *de novo*.

*Id.* at 14, 93 So. 2d at 563 (citations omitted).

The standard of review notwithstanding, Defendant submits that, as to the sole specification of error, the District Court greatly exceeded its authority in failing to conduct a proper Compulsory Process Clause and Due Process Clause

analysis, leading the District Court to erroneously fail to allow Defendant to withdraw her guilty plea and failing to dismiss the indictment in this matter.

**a) Compulsory Process Clause Violation:**

Defendant herein asserts that, the proper *Boykin* colloquy notwithstanding, her guilty plea was rendered involuntary by virtue of the State's systematic and egregious violation of her right to the Compulsory Process Clause of the Sixth Amendment of the United States Constitution by virtue of its reckless disregard and callous indifference to that right in aiding the Nephews in committing coercion and fraud and depriving Defendant of the favorable testimony of Mr. Sidney Dobronich.

The right of the accused to compulsory process has been explained by the United States Seventh Circuit case of *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012), which involved analysis into a state criminal court's exclusion of exculpatory testimony of a child witness based on a determination of competency to testify under Illinois law.   The case of *Harris* provides, in pertinent part, regarding the proper analysis of a Compulsory Process Clause violation:

> The Compulsory Process Clause, which provides that the accused shall have the right "to have compulsory process for obtaining witnesses in his favor," together with the Due Process Clause of the Fourteenth Amendment, embodies a substantive right to present a meaningful and complete criminal defense. *See Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006); *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). "The right to offer the testimony of witnesses, and to compel their attendance, ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas,* 388

41

U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "Few rights are more fundamental than that of an accused to present witnesses in his own defense," *Taylor,* 484 U.S. at 408, 108 S. Ct. 646—a right Chief Justice Marshall described as "sacred." *United States v. Burr,* 25 F. Cas. 30, 33 (C.C.D. Va. 1807). The compulsory process right is an "essential attribute of the adversary system itself," *Taylor,* 484 U.S. at 408, 108 S. Ct. 646, and "imperative to the function of the courts," which "depend on full disclosure of all the facts, within the framework of the rules of evidence." *United States v. Nixon,* 418 U.S. 683, 709, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).

Of course, the right is not unlimited. The defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The accused "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor,* 484 U.S. at 410, 108 S. Ct. 646. While a "trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor," the "countervailing public interest[ ]" in the "integrity of the adversary process, which depends both on the presentation of reliable evidence and rejection of unreliable evidence, ... must also weigh in the balance." *Id.* at 414, 415, 108 S. Ct. 646. Thus, the Compulsory Process Clause does not require criminal courts to admit evidence that is irrelevant, *Crane v. Kentucky,* 476 U.S. 683, 689–90, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986), testimony by persons who are mentally infirm, see *Washington,* 388 U.S. at 23 n. 21, 87 S. Ct. 1920, or evidence that represents a half-truth, see *United States v. Nobles,* 422 U.S. 225, 241, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975).

On the other hand, the exclusion of defense evidence "abridge[s] an accused's right to present a defense" where the restriction is " 'arbitrary' or 'disproportionate to the purposes' [it is] designed to serve," and the evidence "implicate[s] a sufficiently weighty interest of the accused." *United States v. Scheffer,* 523 U.S. 303, 308–09, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998), quoting *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). For

example, the Supreme Court has struck down under the Compulsory Process Clause a rule against introducing the testimony of an alleged accomplice, *Washington,* 388 U.S. at 22–23, 87 S. Ct. 1920; an application of the hearsay bar to statements that "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *Chambers,* 410 U.S. at 300, 93 S. Ct. 1038; the exclusion of evidence bearing on the credibility of a voluntary confession, *Crane,* 476 U.S. at 688–91, 106 S. Ct. 2142; and a *per se* rule excluding all post-hypnosis testimony, *Rock,* 483 U.S. at 56–62, 107 S. Ct. 2704. The Court has acknowledged the "power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability— even if the defendant would prefer to see that evidence admitted." *Crane,* 476 U.S. at 690, 106 S. Ct. 2142. But it simultaneously observed that the "opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence ... when such evidence is central to the defendant's claim of innocence." *Id.*

> The applicable constitutional standard is this: to establish that her right to compulsory process was violated by the exclusion of [the witness's] testimony, [the defendant] must show that (1) the testimony would have been "both material and favorable" to her defense, *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982), and (2) that the exclusion was "arbitrary" or "disproportionate" to the evidentiary purpose advanced by the exclusion, *Scheffer,* 523 U.S. at 308, 118 S. Ct. 1261, quoting *Rock,* 483 U.S. at 56, 107 S. Ct. 2704.

*Id.* at 626-27.

In analyzing the first prong of the compulsory process violation, the federal jurisprudence adopted the materiality requirements of *Brady v. Maryland* line of cases into the Compulsory Process Clause analysis. *Harris,* 698 F.3d at 627 (citing *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S. Ct. 3440 (1982)). Under this standard, the exclusion of a witness is material "only if there is a reasonable

43

likelihood that the testimony could have affected the judgment of the trier of fact.

*Id.*

With regard to the second prong, an exclusion of testimony may be considered arbitrary or disproportionate based on the concept of either an asymmetric rule, or an asymmetric application of a facially neutral rule, that unduly favors the prosecution. The case of *Harris v. Thompson* provides the following explanation:

> The Supreme Court has had only limited occasions to deal in detail with the arbitrary or disproportionate prong of Compulsory Process Clause analysis. One pattern that has emerged is the "parity" principle: a state rule that restricts the presentation of testimony for the defense but not the prosecution will generally be deemed arbitrary. See Akhil Reed Amar, *Sixth Amendment First Principles,* 84 Geo. L.J. 641, 699 (1996). As Professor Amar noted, "the Court has repeatedly struck down asymmetric witness rules, and noted the asymmetry." *Id.* at 700, citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 57 & n. 14, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (distinguishing between symmetric and asymmetric privileges in due process analysis); *Green v. Georgia,* 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) (invalidating, on due process grounds, exclusion of hearsay statement that defendant sought to introduce where government introduced same statement in another criminal proceeding); *Cool v. United States,* 409 U.S. 100, 103 n. 4, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972) (rejecting as "fundamentally unfair" an instruction telling jury it could convict solely on basis of accomplice testimony but not telling jury it could acquit solely on this basis, where defendant put accomplice on the stand); *Chambers v. Mississippi,* 410 U.S. 284, 295–98, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (invalidating, under Due Process Clause, verdict where defendant was barred from impeaching his own witness while government was free to impeach that witness); *Webb v. Texas,* 409 U.S. 95, 96, 98, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972) (per curiam) (trial judge intimidated sole witness for defense but not prosecution witnesses); *Washington v. Texas,* 388 U.S.

> 14, 22, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)
> (accomplices were allowed to testify for government but
> not for defendants); see also *id.* at 24–25, 87 S. Ct. 1920
> (Harlan, J., concurring in the judgment) (stressing this
> fact).

*Id.* at 632-33.   In its explanation, the Court in *Harris* noted the distinction between

an asymmetric rule that favored the prosecution, as the case of *Washington v.*

*Texas*, 388 U.S. 14, 87 S. Ct. 1920 (1967) (overturning a conviction where

exculpatory testimony was precluded based on a rule that prohibited accomplices

from testifying for the defendant, but did not preclude accomplice testimony in

favor of the prosecution); and the asymmetric application of a facially neutral rule.

In analyzing the latter, the jurisprudence applies a balancing test weighing the

value of the excluded evidence to the criminal defendant against the state's

legitimate interest in the criminal trial process that are implicated by the exclusion.

*Harris*, 698 F.3d at 633 (citing *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.

Ct. 1038).

### 1) Material and Favorable Testimony of Mr. Dobronich:

It is without question, and certainly an abuse of discretion to hold otherwise,

that Mr. Dobronich's testimony would have been material and favorable to the

Defendant in this matter.   Mr. Dobronich made two sworn statements in this

matter:  the March 27, 2013 affidavit and his sworn testimony of June 25, 2013,

the latter of which occurred after Mr. Dobronich had been in the exclusive physical

custody of the Nephews pursuant to the wrongfully obtained March 28, 2013

power of attorney.   In his sworn affidavit, Mr. Dobronich states that "Anything

purchased was with his consent and were authorized with his full knowledge" and

"items such as, Kubota Tractor, a 4-wheeler, 2001 Chevy PK, a 2013 Nissan

45

Altima and property(s) [sic] were purchased with [his] knowledge". **(Ex. R. at 228.)** In his sworn testimony, when provided the specific opportunity to disavow the March 27, 2013 affidavit, Mr. Dobronich unequivocally confirms it, not only to counsel for Defendants, but under direct questioning from the Court in the Civil Revocation Action. It is simply an abuse of the District Court's discretion to find that Mr. Dobronich had nothing favorable to offer with his testimony. **(Ex. R. at 222-24.)**

Likewise, it is beyond argument that the testimony of Mr. Dobronich, as the purported victim in any charge of a violation of La. R.S. 14:93.4 was material to the defense of the case. As per the statute, absence of express voluntary consent of the infirmed or aged person is an essential element of La. R.S. 14:93.4(A)(1); and "fraudulent conduct, practices, or representations" is an essential element of La.R.S. 14:93.4 (A)(2). Mr. Dobronich's testimony regarding both his knowledge and his authorization as to the transactions and purchases made by Defendant were not only material, they were dispositive: favorable testimony in this regard eliminates the State's criminal action against Defendant. As such, the District Court's ruling to the contrary is simply an abuse of discretion.

### 2) Interest of Defendant in the Testimony of Mr. Dobronich:

With regard to the balancing inquiry to determine whether the functional elimination of Mr. Dobronich's testimony from the criminal proceedings was "arbitrary" or "disproportionate"; it is clear that Mr. Dobronich's testimony was essential to the defense of this case. As is clear from the evidence, and conceded by the State of Louisiana in brief to the District Court, the State acquired evidence of over 30 transactions, conducted in approximately one month's time, involving

46

$334,000. **(Ex. R. at 117-20, 350.)** While the extrinsic evidence shows examples of Mr. Dobronich unequivocally authorizing sizable transactions (e.g., Mr. Romano witnessing Mr. Dobronich authorize a $179,000 transfer, **(Ex. R. at 174)**, and the March 27, 2013 Affidavit of Mr. Dobronich) **(Ex. R. at 228)**; the sheer number of transactions involved could only have been explained by having Mr. Dobronich explain each transaction.   This point is highlighted by the State of Louisiana itself in its opposition to the underlying Motion before the District Court when it correctly notes that the March 27, 2013 affidavit "did not list all the many withdrawals made from his account."   **(Ex. R. at 351.)**   His unavailability left Defendant in the untenable position of offering only self serving testimony and prevented Defendant from presenting a complete defense in violation of the Compulsory Process Clause and Due Process Clause of the Sixth and Fourteenth Amendments.

### 3)   Interest in the State of Louisiana in the Exclusion of the Testimony of Mr. Dobronich:

#### i)  Absence of Any State Interest in Protection of Criminal Proceedings from Unreliable Testimony:

When compared to the interest of Defendant in having Mr. Dobronich available for testimony, the State of Louisiana had no interest, whatsoever, in depriving Defendant of that testimony, then resuscitating its case with the dubious and intrinsically contradictory testimony of Dr. Garriga.  On this point, the Court's analysis in the case of *Harris v. Thompson*, is very insightful.   As mentioned above, the case of *Harris* involved the exclusion of a five year old witness on the grounds that the child was not competent to testify as a witness.  688 F.3d at 612. The Defendant was tried and convicted of murdering her infant son by strangling

him with an elastic band after she had scolded the child and his brother for leaving

the apartment when she was doing her laundry.  *Id.*  The Defendant had given a

videotaped confession in the case after approximately 27 hours of intermittent

questioning.  *Id.*  The deceased child's brother was in the bunk bed above the

deceased and his proffered testimony indicated that the deceased child had

wrapped the elastic band around his own neck and that neither his father nor

mother had any involvement.  *Id.*  The state court in the criminal case held a

competency hearing for the child witness, whereby the court held that the child to

be incompetent to testify.  *Id.*  The court in *Harris* held that the exclusion of the

child witness from testimony violated the defendant's right to present a complete

defense under the Compulsory Process Clause.  *Id.* at 614.  The court first noted, in

particular detail, the importance of the child's testimony to the defense's case.  *Id.*

at 629-32.[31]  In applying the balancing test, the court further acknowledged the

---

[31] In one portion of the materiality analysis, the court in *Harris* issued a highly critical rebuke of
the state appellate court's determination that the child witness's testimony was not important and
its exclusion amounted to harmless error:

> We respectfully find this analysis to lack merit.  Diante's [the child
> witness] testimony that he saw his brother wrapping the very
> instrument of death around his neck just before he died is far more
> relevant than Dancy's testimony that Jaquari [the victim] had
> wrapped the band around his neck on some previous occasions.

> \*       \*       \*

> By excluding Diante's testimony altogether, the trial court denied
> Harris the opportunity to present the strongest evidence of her
> innocence and impeded the jury in its search for the truth.  The
> appellate court minimized the significance of this exclusion by
> pointing to Diante's ambiguous "admission" and seizing on the
> most favorable interpretation to the prosecution.  That is not how
> harmless error works, and it is not how our materiality analysis
> proceeds under the Compulsory Process Clause.  That inquiry asks
> whether the exclusion of the evidence had a reasonable probability
> of affecting the outcome of trial, and the disqualification of Diante
> did.

48

state's interest in the application of witness competency laws, noting that "witness competency laws advance the same truth-seeking interests as hearsay rules" and "protect the integrity of the adversary process by excluding categorically testimony that is likely to be unreliable." *Id.* at 634-35.  However, given the importance of the testimony to the defense, the court noted that mere adherence to the application of witness competency laws would not satisfy Compulsory Process Clause analysis, further noting the discretion of a trial court, or lack thereof, in simply declaring a witness testimony as unreliable.

> Under the Compulsory Process Clause balancing test, where the challenged witness is critical to the defense's case, the state must have some "plausible reason for believing that" the witness would be "so unreliable as to justify denying [the defendant] the right to introduce the only evidence of his innocence that he had."

*Id.* at 635.

In conducting its analysis and finding that the trial court's exclusion of the child witness's testimony constituted a Compulsory Process Clause violation, the court in *Harris* demonstrated the level of inquiry demanded under such an analysis to exclude a critical defense witness for incompetency under state law:

> In this case, Diante's competency hearing did not reveal that he was so unreliable as a witness as to justify depriving the defense of his uniquely exculpatory testimony. Diante indicated that he knew the difference between the truth and a lie and that one may be rewarded for telling the truth and punished for telling a lie.
>
> \*       \*       \*
>
> Diante also provided a fairly coherent and highly relevant account of what had happened on the day of Jaquari's death: his brother wrapped the cord around his own neck, his parents had not been in the room, and Jaquari went to

*Id.* at 629, 630.

49

"sleep" when a "bubble" formed on his mouth. This was consistent with the physical evidence and with the account he gave to investigators in the days immediately following the death. Nothing suggested that Diante had fabricated the account or been coached. Although a few times it took additional questioning to draw out Diante's precise meaning, he was clearly not so incomprehensible as to have made his entire testimony inherently unreliable.

Diante was by no means a perfect witness. He said that he believed Santa Claus and Spiderman were real and that he had seen Jaquari "in heaven." He also told investigators Levy and Wilson that he had been asleep when Jaquari got hurt, which was superficially inconsistent with the defense's claim that Diante witnessed Jaquari's death. (Nobody asked him to explain the difference.) And he did not respond to the court's satisfaction to two of its questions: first, whether he could "remember anything else that happened that day" (he said no); and second, whether he had "spoken before with any of the people who are here today before you came to court." (Diante again said no, even though he had previously spoken to the prosecutor).

But none of these responses were explored by the court or counsel with even minimal follow-up. Had there been any, the court should have gained the same insights that Dr. Galatzer–Levy did: that Diante believed Santa and Spiderman were real to the extent they were not cartoons; that by "heaven," Jaquari probably meant "church"; that he did not realize that he witnessed Jaquari die because he did not understand death; and that he remembered many details from the day of Jaquari's death. Moreover, even if like many six-year-olds Diante believed that these mythical characters were real, such imaginings were not commingled with his memory of the day of Jaquari's death and would not have hindered his ability to tell what he saw.

*Id.* at 636-37.

The analysis in the case of *Harris* indicated the depth of inquiry into mental capacity when dealing with a witness that is determined to be essential to the defense's case. The court not only examined the contents of the questions, but also

the types of questions asked, the manner in which the questions were asked, the

content and manner of the answers given and whether appropriate follow questions

were posed.  As such, the *Harris* court's thorough and detailed analysis noted a

distinction between a flawed witness, an incompetent witness under state law, and

an patently unreliable witness under Compulsory Process Clause analysis.  *Id.* at

637-38.  In conducting its Compulsory Process Clause analysis, the court in *Harris*

not only rejected the state court's findings that the child witness was not

sufficiently unreliable to justify the exclusion of his testimony, but characterized

the court's determination as a "glaring failure":

> The bigger issue, and the trial court's more glaring
> failure at the competency hearing, was its unrealistic
> expectations for a six-year-old witness. As Illinois courts
> have emphasized, "[i]t is not incumbent upon a child to
> give perfect answers to questions asked during the
> competency determination or at trial to be deemed a
> competent witness." *Williams,* 322 Ill. Dec. 613, 891
> N.E.2d at 932, quoting *Sutherland,* 252 Ill. Dec. 851, 743
> N.E.2d at 1013. A child's belief in Santa Claus or
> Spiderman does not make the child's testimony about his
> real-life experiences unreliable. Nor does Diante's
> negative response to the court's general inquiry if he
> remembered anything else from the day. Such a broad,
> open-ended question in a hearing or deposition often
> confuses adults who have already been testifying about
> what they remember. It was unlikely to elicit a detailed,
> substantive account of the day's events from a six-year-
> old, especially when posed by a stranger in a black robe.
> Likewise, the trial court's question, "Have you spoken
> before with any of the people who are here today before
> you came to court?" was both compound and ambiguous
> enough that many adults might have trouble answering it.
> Was the judge asking whether Diante had *ever* spoken
> before with anyone present at court that day? Or whether
> he had spoken *that day* with anyone present before
> coming to court? And how many people were in the
> courtroom? The answer says nothing probative about
> Diante's reliability as a witness. There was no follow-up
> to make sure he even understood the question.

51

*Id.* at 637, 38.

As mentioned above, Mr. Dobronich was deceased at the time of trial, but it is inarguable that the Defendant had a considerable interest in the opportunity to secure his favorable testimony, which existed from March 18, 2013 through his death on March 24, 2014, in light of the State's attempt to raise the issue of his competency to authorize the Defendant's transactions in this case. This District Court in this case was required to balance the Defendant's interest in the opportunity to procure Mr. Dobronich's favorable testimony with the State's involvement with, and interest in, preventing Mr. Dobronich from providing that testimony from the initiation of criminal proceedings against Defendant.

In this case, the Defendant's interest in Mr. Dobronich's testimony is even stronger that the defendant in *Harris*. While the witness in *Harris* was had exculpatory testimony, the testimony of Mr. Dobronich, as the "victim", was potentially dispositive. This is so particularly where, as here, the Defendant contends that each and every one of the 30 plus transactions involving over $330,000 in less than one month's time can only be explained by Mr. Dobronich himself. Mr. Dobronich's testimony explaining the substantial evidence of the state in the form of financial records is even more critical to the case of Defendant in the extant case, than the testimony of the child witness was in the case of *Harris*.

The critical importance of Mr. Dobronich's testimony notwithstanding; the analysis of the District Court does not even come close to the reliability analysis conducted by the state criminal court in *Harris*, which the court in *Harris* rejected as insufficient under the Compulsory Process Clause. The District Court

52

presumably relied upon the expert report and testimony of Dr. Garriga, concluding that Mr. Dobronich suffered from "major neurocognitive disorder", **(Ex. R. at 111)**, and the August 27, 2013 Judgment of the Court in the Civil Revocation Action declaring Mr. Dobronich incompetent to testify, **(Ex. R. at 145)**. The District Court did not critically address the internal discrepancies in Dr. Garriga's analysis: her failure to properly account for the several instances where Mr. Dobronich's cognitive functions were determined to be normal or highly functioning or medical records concluding that Mr. Dobronich "ha[d] decision making capacity", **(Ex. R. at 180)**; her internally discredited assumption that Mr. Dobronich had always been conservative in his financial affairs. The District Court did not properly account for Dr. Garriga's reliance on "descri[ptions] by his family" regarding any analysis of Mr. Dobronich's mental competency in light of the uncontroverted evidence of "family'[s]" attempt to fraudulently probate a purported will allegedly executed during the same time Dr. Garriga opined that Mr. Dobronich lacked the mental capacity to execute such a will.

Additionally, as indicated by the analysis in *Harris*, the District Court could not simply accept the August 27, 2013 judgment of the Court in the Civil Revocation Action, nor that Court's woefully inadequate competency inquiry, as a basis for declaring the Defendant's opportunity to obtain Mr. Dobronich's critical testimony to be of no value under the Compulsory Process Clause. If the state court's competency inquiry in the case of *Harris* was inadequate to support a finding of constitutionally unreliable testimony in that case; then the District Court's reliance in this case on the Civil Revocation Action Court's "why are we here" inquiry is even more so. The court in *Harris* is clear as to the level and

53

manner of questioning required before a court can deprive a Defendant of the opportunity to present essential witness testimony under the Compulsory Process Clause. The Court in the Civil Revocation Action asked five, very vague and confusing questions. **(Ex. R. at 227.)** The nature of these questions, emanating from the bench would arguably be confusing, and possibly intimidating to persons of any age, let alone to an elderly gentleman who was, at that time, arguably fatigued. This is simply no basis for the District Court to declare Mr. Dobronich's testimony as constitutionally unreliable, to allow the State of Louisiana to resuscitate its case against Defendant with a post mortem expert opinion on his lack of competency, and force the Defendant to explain his authorization of over 30 transactions for over $330,000 in one month's time.

More importantly, as indicated by minutes of the January 29, 2015 hearing, the District Court, while finding Mr. Dobronich incompetent, explicitly accepted the State's position that it was entitled to restitution hearing for the "victim". **(Ex. R. at 360.)** In so holding, the District Court accepted the basis for the "victims", George and Forest Dobronich, to obtain some form of restitution. The evidence of that basis is the testimony of Det. Montgomery, gleaned from his purported conversations with Mr. Dobronich. **(Ex. R. at 115.)** That evidence is also, shockingly, the July 18, 2013 olographic testament; purportedly executed during the time when the Nephews were advocating to the Court in the Civil Revocation Action that Mr. Dobronich was incompetent to manage his affairs consistent with his own interest and even to testify at a deposition. **(Ex. R. at 146-47, 148, 150, 313, 320-21.)** The District Court's findings, as reflected in the minutes of the January 29, 2015 hearings, indicated that the District Court ACCEPTED Dr.

Garriga's conclusion in her report, and the August 27, 2013 judgment of the Court in the civil revocation action, for the purpose of declaring Mr. Dobronich's testimony as unreliable; but REJECTED that very same evidence in determining the State of Louisiana's right to a determination of restitution. Given these internally contradictory holdings, the District Court cannot justify the State's functional exclusion of Mr. Dobronich's favorable testimony by depriving Defendant the opportunity to secure same. Respectfully, these contradictory holdings are by themselves, the very definition of arbitrariness, irrespective of the critical nature of Mr. Dobronich's testimony in this matter. As such, the District Court exceeded its authority in finding an absence of a Compulsory Process Clause violation based on the findings of Dr. Garriga and the August 27, 2013 Judgment of the Court in the Civil Revocation Action.

### ii) Absence of State Interest in Wrongful Conduct, with which it was directly involved and which it has adopted under the "State Actor" Doctrine.

Additionally, and beyond the acceptance of dubious evidence of the unreliability of Mr. Dobronich's critical testimony, the State's interest in depriving Defendant the opportunity to secure Mr. Dobronich's favorable testimony is based on wrongful conduct, in which it was both directly involved and had adopted under the "state actor" analysis. It is axiomatic in the federal constitutional law jurisprudence that the state cannot be said to have any legitimate interest in wrongful conduct that is illegal, fraudulent, or constitutes invidious discrimination. The testimony of Dr. Garriga and the August 27, 2013 Judgment of the Court in the Civil Revocation Action notwithstanding; the undisputed evidence in this case, upon which the aforementioned evidence is based, indicated that the unavailability

55

of Mr. Dobronich's favorable testimony was caused by a series of wrongful conduct, which are hereby summarized as follows.

First, the acquisition of the March 28, 2013 power of attorney in favor of the Nephews was improperly obtained. This power of attorney was obtained without the consent of Mr. Dobronich, **(Ex. R. at 131)**, and was continuously used to keep Mr. Dobronich in the custody of the Nephews and to prevent him from providing truthful testimony that would prejudice the Nephew's claim to Mr. Dobronich's estate, **(Ex. R. at 284-85, 293, 294, 295-301, 302-06)**.

Second, even assuming the validity of the March 28, 2013 power of attorney, the procurement of the Judgment declaring Mr. Dobronich incompetent was in direct violation of the fiduciary duty that the Nephews owed to Mr. Dobronich. It is undisputed that the Nephews, by virtue of the March 28, 2013 power of attorney, acquired control over Mr. Dobronich's property and even his person. It is also undisputed that the Nephews, pursuant to that purported authority under the March 28, 2013 power of attorney, had filed the Civil Revocation Action on Mr. Dobronich's behalf, in their capacity as his agents of fact. **(Ex. R. at 257, 269.)** In that capacity, the Nephews made submissions to the Court in the Civil Revocation Action, in the form of two reports from Dr. Verrette, that advocated for the Court to declare Mr. Dobronich, the principal, incompetent to manage his affairs or even to testify in a deposition. **(Ex. R. at 146-47, 320-21.)** The law in the State of Louisiana regarding the fiduciary duty of an agent to his/her principle, unquestionably applicable to the Nephews, *vis a vis* Mr. Dobronich, is clear:

> We hold, therefore, that an agent who acquires his
> principal's property, or one who otherwise acts in a

> fiduciary capacity, bears the burden of establishing that
> the transaction was an arm's length affair. This means
> that the agent or fiduciary must handle the matter as
> though it were his own affair. It also means the agent or
> fiduciary may not take even the slightest advantage, but
> must zealously, diligently and honestly guard and
> champion the rights of his principal against all other
> persons whomsoever, and is bound not to act in
> antagonism, opposition or conflict with the interest of the
> principal to even the slightest extent. The reason for the
> rule is obvious.

*Noe v. Roussell*, 310 So. 2d 818-19 (La. 1975). It is beyond dispute that having an

individual declared judicially incompetent to manage his/her own affairs, or even

to testify in a judicial proceeding, is an action against the interest of that person.

The Nephews had taken a position clearly against the interest of Mr. Dobronich,

again, for their own personal advantage to prevent Mr. Dobronich from prejudicing

their purported claims to his estate.

Finally, and most egregiously, the determination of incompetency of Mr.

Dobronich was predicated on outright fraud upon the 22nd Judicial District Court.

At the very same time that the Nephews were advocating for a Judgment of

incompetency in the Civil Revocation Action (before Division "D" of the 22nd

Judicial District Court) **(Ex. R. at 146-47, 313, 320-21)**; they witnessed Mr.

Dobronich "executing" an olographic testament naming themselves as heirs to his

estate, **(Ex. R. at 148-50)**. This testament was probated by affidavit and filed in

the Successions proceedings (before Division "I" of the 22nd Judicial District

Court). *Id.* The only parties who have any standing to object to this egregious

fraud, and who have attempted to do so, are the Defendant and her husband, who

during that time have been subject to this criminal matter.

With regard to the first instance of wrongful conduct, the State of Louisiana has direct involvement.   As evidenced by his own notes, Det. Montgomery affirmatively supported the Nephews assumption of power of attorney over Mr. Dobronich on March 28, 2013, despite his having clear evidence from Mr. Dobronich himself that he "recalled signing something but didn't know what it was", clearly indicating that such power of attorney was unlawfully obtained. **(Ex. R. at 131.)**   This unlawful State involvement was further complicated by the State of Louisiana itself when it took the position of Dr. Garriga that Mr. Dobronich was not competent to conduct transactions from before February 2013 through his death in March 2014, **(Ex. R. at 111-112)**, which would include the March 28, 2013 power of attorney, known by Det. Montgomery to have been acquired by the Nephews as of April 2, 2013.

As to the direct actions of the Nephews in wrongfully procuring the March 28, 2013 power of attorney, wrongfully preventing Mr. Dobronich from testifying on behalf of Defendant and having him declared incompetent; federal constitutional law jurisprudence provides that such conduct is imputed to the State of Louisiana in this case and, therefore rises to the level of a violation of the Compulsory Process Clause and Due Process Clause.   Under constitutional law jurisprudence, as recognized by the United States Supreme Court, wrongful conduct of a private party may rise to the level of a constitutional violation committed by the State. *N.C.A.A. v. Tarkanian*, 488 U.S. 179, 192, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988). The case of *N.C.A.A. v. Tarkanian*, provides a succinct description of the application of the state actor doctrine:

58

> In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur if the State creates the legal framework governing the conduct, *e.g., North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S. Ct. 719, 42 L. Ed. 2d 751 (1975); if it delegates its authority to the private actor, *e.g., West v. Atkins,* 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); or **sometimes if it knowingly accepts the benefits derived from unconstitutional behavior,** *e.g., Burton v. Wilmington Parking Authority, supra.* Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.

*Id.* at 192 (emphasis added).

In this case, it is clear that the State of Louisiana and the Nephews are mutually benefitting from the activities of the Nephews in preventing Mr. Dobronich's testimony. As noted in *N.C.A.A. v. Tarkanian*, the case of *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961), provides the appropriate analytical framework. The case of *Burton* involved discrimination against an African American patron conducted by a private restaurant that had leased space in a state owned parking garage. 365 U.S. at 720. In determining whether the discrimination perpetrated by the privately owned restaurant rose to the level of state action prohibited by the Equal Protection Clause, the Court noted that the land and building were publicly owned, and the private restaurant and public garage received mutual benefits in the form of increased customer traffic for both the restaurant and garage, as well as rent paid by the restaurant to the garage. *Id.* at 723-24. In holding that the discriminatory actions of the restaurant were imputable to the State and rose to the level of a

violation of the Equal Protection Clause, and further explained that such a violation could exist solely by the failure of the State to prevent the discriminatory practices, regardless of any finding of bad faith on the part of the State:

> Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, **indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.** It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, but at the same time fully enjoys equal access to nearby restaurants in wholly privately owned buildings. As the Chancellor pointed out, in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. **But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.** It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend upon such a distinction. **By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment.**

*Id.* at 724-25 (emphasis added).

From the inception of the State's investigation on March 18, 2013, the State, as described in *Burton*, "has so far insinuated itself into a position of interdependence" with the Nephews in the concurring civil and criminal proceedings, resulting in an egregious violation of fundamental Due Process, in general, and a violation of the Compulsory Process Clause, in particular. In particular, both the State and the Nephews have acted interdependently to acquire custody of Mr. Dobronich via the execution of the March 28, 2013 power of attorney, prevent him from providing any truthful testimony by way of deposition, despite consistent and repeated attempts to acquire such testimony by Defendant's counsel, and to wrongfully and fraudulently have him declared incompetent by the Court in the Civil Revocation Action, in clear violation the Nephews fiduciary duty to Mr. Dobronich. As in the case of *Burton*, contrary to its assertions in its January 22, 2015 Opposition, the motives of the State of Louisiana are not at issue: as the State clearly was aware of this wrongful conduct. This awareness is evidenced not only by its *Brady* submissions to the Defendant, but also by its own admission in its January 22, 2015 Opposition, asserting that it was aware of such conduct as early as September 10, 2014. **(Ex. R. at 348.)** These *Brady* submissions, made after Mr. Dobronich had passed away, at a time when his testimony could no longer be of assistance, are simply insufficient to remedy the egregious Compulsory Process Clause violation that had been perpetrated by the Nephews with the auspices of the State. The State of Louisiana, with the knowledge of this wrongful conduct, perfected it by proceeding with the prosecution and by propounding the dubious expert testimony of Dr. Garriga, which contained not only internal inconsistencies, but also directly discredited the State's own

61

investigation and investigator.  Whether intended or not by the State of Louisiana, though certainly intended by the Nephews, the aggregate effect of this conduct was to deprive Defendant of the opportunity to obtain and present Mr. Dobronich's exculpatory testimony and to force Defendant to ultimately explain the essentially unexplainable with her own self serving testimony:   that Mr. Dobronich specifically authorized over 30 transactions, amounting to over $334,000 in less than one month's time.

Nor can the State's cynical argument that the Defense initially moved the Court to Exclude Mr. Dobronich's testimony on December 13, 2013 salvage its position.  This otherwise rational decision by prior defense counsel was made without the knowledge of the purported July 18, 2013 "testament" of Mr. Dobronich, the Nephew's intention to commit fraud by attempting to probate same, or the State's intention to use post mortem expert testimony of incompetence as a vehicle to continue the criminal proceedings against the Defendant.  Arguably, at that time, the State of Louisiana was also not aware of the full extent and depth of the Nephew's fraud, and was not so aware until it admitted as such on September 10, 2014.  At that time, the State of Louisiana unquestionably assumed a duty under the Due Process Clause and the Compulsory Process Clause to discontinue its position regarding Mr. Dobronich's competence and to discontinue its prosecution against the Defendant. The State cannot claim any ability to abdicate this duty based on prior defense counsel's erroneous reliance on the results of the Nephew's fraudulent conduct.

This joint participation between the Nephews and the State of Louisiana, as adopted by the State of Louisiana on September 10, 2014, was punctuated by the

openly and notoriously biased pre-sentence investigation report ("PSIR") conducted by the Louisiana Department of Corrections. The PSIR, as illustrated in the unapologetic statement of Forest Dobronich, established that the basis of the pre-sentence investigation was in retaliation for Defendant's exercise of her right to challenge the Nephews' heirship to Mr. Dobronich's estate, and the insidious circumstances in which they acquired same. Given all of these circumstances and the uncontroverted evidence presented to the District Court, the District Court failed to conduct a proper Compulsory Process Clause analysis and exceeded its authority for failing to find a violation of same. Similarly and thusly, the District Court abused its discretion in not permitting Defendant to withdraw her guilty plea and in not dismissing the indictment against her.

## CONCLUSION and PRAYER

**WHEREFORE,** based on the above, applicant prays for, and is entitled to, withdraw her plea of guilty under La. C. Cr. P. Article 559, as that plea was obtained in violation of her constitutional rights under the Compulsory Process Clause and is rendered involuntary thereby.  Finally, in light of the violation of Defendant's constitutional rights under the Compulsory Process Clause and the fact that the violation cannot be remedied, the indictment against Defendant herein should be dismissed.

Respectfully submitted,

**CLAIBORNE W. BROWN (25594)**
222 N. Vermont Street, Suite I
Covington, LA  70433
Telephone:  (985) 246-7063
Facsimile:  (985) 246-7080
*cwbrown@cwbrownlaw.com*

64

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have served a copy of the above and foregoing pleading on all counsel of record herein by mailing same by United States Mail, properly addressed and first class postage prepaid, on this _18_ day of February, 2015.

_____
**CLAIBORNE W. BROWN (25594)**
222 N. Vermont Street, Suite I
Covington, LA  70433
Telephone:  (985) 246-7063
Facsimile:  (985) 246-7080
*cwbrown@cwbrownlaw.com*

65